[No. C050978. Third Dist. Apr. 12, 2007.]

AIR COURIERS INTERNATIONAL et al., Plaintiffs and Appellants, v. EMPLOYMENT DEVELOPMENT DEPARTMENT et al., Defendants and Respondents.

924

COUNSEL

Hochman, Salkin, Rettig, Toscher & Perez, Dennis L. Perez and Michel R. Stein for Plaintiffs and Appellants.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, William L. Carter and Steven J. Green, Deputy Attorneys General, for Defendants and Respondents.

OPINION

RAYE, J.—Different tax results flow from whether a worker is classified as an employee or an independent contractor. Plaintiffs Air Couriers International (formerly known as Sonic Couriers of Arizona, Inc.), UPS Service Parts Logistics, Inc. (formerly known as Sonic Air, Inc., and Arizona Sonic Air, Inc.), and UPS Logistics Group (collectively referred to as Sonic) employ drivers to pick up and deliver packages in a timely manner. Sonic filed a complaint for refund against defendant Director of the Employment Development Department (Department) to recover employment taxes it paid for the drivers. Sonic argued the drivers operated as independent contractors, a claim rejected by the trial court following a court trial. Sonic appeals, contending the trial court employed the wrong standard, no substantial evidence supports the court's finding of employment status, and the court abused its discretion in holding Sonic liable for penalties. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2003 Sonic filed suit as authorized by Unemployment Insurance Code section 1241 to recover "Contributions, Personal Income Tax, Penalties and Interest." The Department filed an answer and the case proceeded to a court trial.

*Sonic's Case*

At trial, Sonic presented testimony by dispatchers, drivers, supervisors, and a retired operations vice-president regarding the circumstances of the drivers' employment. Drivers delivered packages between businesses and to the airport. Drivers serviced numerous customers; fewer than 1 percent performed services for only one customer.

Drivers worked flexible schedules. Individual drivers determined their own schedules and decided when and how long to work. Some drivers, by choice, worked long hours. Drivers took breaks, and they alone determined the frequency and duration of the breaks.

Many drivers worked other jobs while driving for Sonic. These other jobs could conflict with their Sonic work. Sonic made no effort to prevent drivers from working other jobs, including delivering for other companies.

Sonic did not require drivers to accept each and every job. To the contrary, drivers rejected jobs for a variety of reasons and were not required to provide reasons for doing so. Drivers who rejected jobs did not suffer adverse consequences; they continued to receive assignments.

Drivers were paid by the job, with mileage factored into the job rate. Sonic paid drivers biweekly based on handwritten and computer manifests. Sonic did not provide the drivers sick leave, paid vacation, or medical insurance.

Many jobs were paid under a flat rate, based on the number of miles driven. Drivers negotiated higher rates on some jobs for a variety of reasons, including "after hours" charges, premiums for long drives, amounts added for "deadhead miles," and weekend charges. There were no negative repercussions for negotiating rates.

Drivers with superior skills made more money. These drivers possessed better communication and customer relations skills, worked better under the pressure of time-sensitive deliveries, and were savvy about pricing their jobs.

Sonic did not provide drivers with formal training. Instead, new drivers often learned the ropes from family members who also worked for Sonic.

Drivers supplied their own vehicles, supplies, and equipment when delivering for Sonic. Drivers typically drove their own pickup trucks and used their own cellular phones, and some provided their own business cards.

Sonic did not require drivers to wear uniforms, and most did not, although some drivers wore uniforms to expedite access to buildings and airports. Nor did Sonic require drivers to wear identification badges, although some drivers used identification badges to gain access to airports and high security buildings.

Sonic issued Internal Revenue Service 1099 forms to drivers that reflected the amount of compensation earned for the year. Drivers reported the income earned from driving on their individual tax returns and deducted expenses incurred.

Sonic began utilizing independent contract drivers in response to intense competition, which made use of salaried drivers unfeasible. Independent drivers allowed Sonic to avoid the cost of maintaining a fleet of delivery vehicles, and to save on administrative costs. Sonic did not employ independent contractors to save on taxes.

Dispatchers, who were Sonic salaried employees, called drivers and gave out work assignments. Dispatchers did not provide driving directions. Instead, drivers determined their own routes and order of delivery.

Almost all drivers executed independent contractor agreements (Contract) beginning in 1994. When a new driver signed up, Sonic's operations manager reviewed the Contract with the driver, paragraph by paragraph, and answered the driver's questions about the document. The operations manager made sure the drivers understood "what independent contractor meant to them." The drivers understood they operated as independent contractors.

*The Department's Case*

This appeal requires us to determine whether sufficient evidence supports the trial court's finding that Sonic's drivers did not operate as independent contractors. The Department does not undertake an analysis of the evidence produced at trial. The Department's brief merely quotes the trial court's final statement of decision.

A party on appeal has the duty to support the arguments in the briefs by appropriate reference to the record, which includes providing exact page citations. We have no duty to search the record for evidence and may disregard any factual contention not supported by proper citations to the record. (*Redevelopment Agency v. Rados Bros.* (2001) 95 Cal.App.4th 309, 317, fn. 6 [115 Cal.Rptr.2d 234].)

It is incumbent upon the respondent, in responding to a claim of insufficient evidence, to provide this court with an accurate summary of the evidence, complete with page citations, that the respondent believes supports the trial court's judgment. The Department has failed to comply with this requirement. Simply citing the trial court's judgment is neither helpful nor sufficient. Nonetheless, we conclude the judgment is supported by ample evidence.

The Department presented testimony from several drivers and an auditor from the California Franchise Tax Board, who presented a far different picture of the relationship between Sonic and the delivery drivers.

Harry Contos, a Sonic driver since 1984 and ultimately a branch manager, testified many drivers never signed a Contract with Sonic during the period from 1992 to mid-1994. In most cases drivers did not turn down jobs relayed

to them by the dispatchers. Dispatchers gave drivers the pickup and delivery times, and drivers were terminated if they proved unreliable.

New drivers began by driving with more experienced Sonic drivers. Sonic also provided a training video. Uniforms were available for drivers. Uniforms were useful for identification as a Sonic driver and also prevented drivers from working for other employers while uniformed. Many drivers worked as Sonic drivers for lengthy tenures.

Ronald Kelly had worked for Sonic since 1995. Kelly signed a contract, but no one explained the meaning of independent contractor to him. After going to work for Sonic, Kelly did not add Sonic to his automobile insurance or obtain workers' compensation insurance. Kelly did not obtain a business license or solicit other delivery customers.

As a new driver, Kelly drove around with a more experienced Sonic driver. Sonic provided a pager that Kelly used to respond to the dispatcher.

Kelly worked 11 hours a day, Monday through Friday. He also worked long hours on the weekends. Every job involved a deadline, and Kelly rarely turned down jobs. Monday through Friday Kelly regularly provided delivery services for the same customers. Sonic paid him biweekly.

Kelly wore a Sonic identification badge and purchased a uniform. He attended about four meetings in which Sonic discussed driver complaints. Sonic also provided special logo tape for packages and manifest sheets on which to record his deliveries.

On cross-examination, Kelly acknowledged he could have chosen to work shorter hours. He also could take vacations whenever he wished without having to inform Sonic of his absence. Sonic did not require Kelly to attend meetings. Kelly did not receive sick pay, bonuses, vacation pay, or health insurance from Sonic.

Timothy Glasser drove for Sonic from 1989 through April 1994. Glasser could not recall ever signing a Contract with Sonic. He believed he never received any paperwork explaining his relationship with Sonic or his responsibilities. On his first day of work Glasser was told he was an independent contractor. He asked if he needed special insurance but was told he did not. Sonic paid Glasser by the hour for hours worked Monday through Friday.

Glasser rarely turned down jobs. He possessed no business license, took out no advertising, and had no other employer. Glasser never employed anyone to assist him with his deliveries. Sonic provided logo packages, tape, and a placard for his windshield. Glasser used his personal vehicle for delivering packages.

On cross-examination, Glasser testified he paid his own expenses when making deliveries. Sonic did not supervise or discipline him, and he received no vacation or sick pay.

Christopher Kee drove for Sonic from 1985 through fall of 1996. His ex-wife was also employed at Sonic and worked as a dispatcher and driver. Kee could not recall ever signing a Contract.

Kee worked a regular route, picking up from the same customers each day. Sonic provided him a pager, and Kee had a mailbox at Sonic. Kee wore a Sonic uniform shirt at Sonic's request. The uniform enabled drivers to maintain a professional appearance, particularly around upper management. Most drivers wore the uniform shirts.

Kee was paid by the job and rarely turned down jobs. Kee believed turning down a job created the risk of not getting any more work. His ex-wife, who worked as a dispatcher and driver, told him this was company policy. Kee successfully negotiated a higher rate for one job; he was unsuccessful in another attempt at negotiation.

Kee did not deliver for any other company while working at Sonic. He did not have a business license, purchase insurance, or buy a special vehicle. Kee did not solicit customers. He believed the dispatcher supervised him.

Kee, during cross-examination, testified Sonic never disciplined him. Nor did Sonic pay sick leave, vacation leave, or bonuses.

Cherrie Hayes, a former tax auditor for the Department, performed an audit at Sonic covering the years 1992 through 1994. The audit's purpose was to determine whether 17 Sonic drivers were properly classified as independent contractors. Hayes used Department criteria to make her determination. Hayes found only one driver qualified as an independent contractor; this driver had made a substantial financial investment in a large long-haul truck.

Hayes interviewed the other 16 drivers and asked for documentation such as business licenses, insurance, or contracts that would support a finding of

independent contractor status. She found no evidence the drivers worked for employers other than Sonic; none of the drivers had invested in vehicles specifically earmarked for deliveries or had business licenses. In addition, neither the drivers nor Sonic were able to produce any contracts. Although Sonic's management promised to provide Hayes with documentation supporting its assertion of independent contractor status, no documentation was ever forthcoming.

Hayes ultimately concluded the 16 drivers were not independent contractors. On cross-examination, Hayes acknowledged drivers could determine their own routes, could reject assignments, and received no formal training from Sonic. However, Hayes also testified drivers who rejected jobs risked not getting future jobs. Hayes was not aware of any drivers negotiating rates.

*The Trial Court's Decision*

The trial court found, as a matter of law, that Sonic's drivers were not independent contractors. Although Sonic claimed all its drivers executed the Contract that established the independent contractor relationship, the court found no evidence was presented that four drivers who testified executed any Contract, and one driver testified he operated without a Contract. In addition, Sonic produced three conflicting versions of the Contract at trial, and testimony revealed Sonic failed to enforce the Contract. Sonic also failed to ensure the drivers understood the legal and practical ramifications of the Contract. For these reasons, the court found the Sonic Contracts insufficient to have created an independent contractor relationship between the company and its drivers.

The court determined the drivers performed an integral and entirely essential aspect of Sonic's business. Sonic provided forms the drivers were required to utilize in order to be paid, provided pickup and delivery deadlines for each delivery, encouraged drivers to wear uniforms, and provided identification badges and vehicle placards. The customers serviced by the drivers were Sonic customers, not customers of the drivers. Therefore, Sonic retained all necessary control over the drivers, negating its claim that the drivers operated as independent contractors.

The trial court entered judgment in favor of the Department. Sonic filed a timely notice of appeal.

## DISCUSSION

### I

California has established an unemployment insurance program providing benefits for "persons unemployed through no fault of their own, and to

reduce involuntary unemployment and the suffering caused thereby to a minimum." (Unemp. Ins. Code, § 100.)[1] Contributions from employers to the Department completely fund the program. (§ 976.)

In addition, the Department administers a disability insurance program that mitigates the burdens that fall on the unemployed and disabled worker and his or her family. (§ 2601.) Contributions from workers withheld by employers and remitted to the Department fund this program. (§§ 984, 986.)

The Department also administers a program designed to "promptly place job-ready individuals in suitable jobs, to provide qualified job applicants to employers, to assist potentially employable individuals to become job ready, and to create employment opportunities." (§ 9000.) The program is funded by contributions from employers based on wages paid to employees. (§ 976.6.)

■ Sections 13020 and 13021 require employers to withhold and remit to the Department their employees' state income tax payments. Section 621, subdivision (b) defines an employee as "Any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." An independent contractor does not come within the scope of these provisions. (*Empire Star Mines Co. v. Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43 [168 P.2d 686] (*Empire Star*).)

Sonic filed suit against the Department for a refund of contributions, interest, and penalties pursuant to section 1241 following the issuance of assessments to Sonic and Sonic's payment to the Department. Sonic argues these payments, totaling $617,328.33 plus interest, were incorrectly levied against independent contractor drivers rather than employees.

## II

Sonic begins by challenging the trial court's reliance on *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 [256 Cal.Rptr. 543, 769 P.2d 399] (*Borello*) in determining the drivers' status. Sonic argues *Borello* applies only to workers' compensation cases and the present case involves employment taxes incorrectly assessed under the Unemployment Insurance Code. Sonic contends the trial court should have applied the legal standard for worker classification set forth in *Empire Star*.

As Sonic correctly notes, the determination of the correct legal standard to be applied by the trial court presents a question of law, which we review de novo. (*Topanga and Victory Partners v. Toghia* (2002) 103 Cal.App.4th 775,

---

[1] All further statutory references are to the Unemployment Insurance Code.

779–780 [127 Cal.Rptr.2d 104].) We begin our consideration of the appropriate standard of review with the oldest case on employment status, *Empire Star*, in which the Supreme Court considered whether individuals who leased portions of Empire Star's mine were employees or independent contractors. Empire Star claimed the leaseholders were independent contractors and requested reimbursement of unemployment insurance taxes. (*Empire Star*, *supra*, 28 Cal.2d at pp. 36–37.)

■ To determine the status of the leaseholders, the Supreme Court noted the "most important factor is the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists. Strong evidence in support of an employment relationship is the right to discharge at will, without cause." (*Empire Star*, *supra*, 28 Cal.2d at p. 43.)

It is this language that Sonic seizes upon, focusing laser-like on the issue of control. However, the *Empire Star* court did not set forth control as the sole consideration in evaluating the employment relationship.

Instead, the court noted: "Other factors to be taken into consideration are (a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Empire Star*, *supra*, 28 Cal.2d at pp. 43–44; Rest., Agency, § 220.)

Applying the primary factor of control and the secondary enumerated factors, the *Empire Star* court found the leaseholders determined for themselves what work they would do and how it should be done. They fixed their own working time, and no leaseholder was requested to discharge anyone. All of this evidence tended to prove the leaseholders were carrying on mining activities at their own risk and for their own profit. The Supreme Court found the leaseholders were not employees and ordered the taxes reimbursed. (*Empire Star*, *supra*, 28 Cal.2d at pp. 44–45, 49.)

The Supreme Court considered another unemployment insurance reimbursement case in *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943 [88 Cal.Rptr. 175, 471 P.2d 975] (*Tieberg*). In *Tieberg*, the court considered whether individuals hired as writers of teleplays were employees or independent contractors of a television producer. Citing *Empire Star*, the *Tieberg* court reiterated the primacy of control and also noted the secondary factors to be considered in evaluating employment status. (*Tieberg, supra,* 2 Cal.3d at pp. 949–950.) The court found the producer exercised control and direction over the writers in supervising rewrites. In addition, the court found several of the secondary factors pointed toward the writers of teleplays as employees of the producer. (*Id.* at pp. 952–953.)

This court, in *Grant v. Woods* (1977) 71 Cal.App.3d 647 [139 Cal.Rptr. 533] (*Grant*), considered whether newspaper carriers were employees in an action for refund of contributions paid into the Unemployment Insurance Fund. We cited *Empire Star* for the proposition that the primary factor to be considered is whether the right to control lies within the relationship. We observed: "If an employment relationship exists, the fact that a certain amount of freedom is allowed or is inherent in the nature of the work involved does not change the character of the relationship, particularly where the employer has general supervision and control." (*Grant, supra,* 71 Cal.App.3d at p. 653.) We also echoed *Empire Star* and *Tieberg* in noting the list of secondary factors to be considered in evaluating the employment relationship. (*Grant, supra,* 71 Cal.App.3d at pp. 652–653 & fn. 2.)

In concluding newspaper carriers were employees and not independent contractors, we found newspaper delivery is not a highly skilled operation requiring close scrutiny and control by the employer. A certain amount of employee freedom is inherent in the work. The employer possessed the right to control the carriers: he required papers be delivered to specific subscribers at a specified time, handled complaints, advised carriers on methods of operation, and retained the right to terminate carriers. In addition, the carriers were not involved in a separate and distinct occupation of their own; they were essential to the employer's business. Many carriers were employed for lengthy periods of time. (*Grant, supra,* 71 Cal.App.3d at p. 653.)

*Borello*, the source of much controversy in the present case, followed in 1989. In *Borello*, as Sonic repeatedly points out, the court determined whether agricultural laborers engaged to harvest cucumbers under a written "sharefarmer" agreement were independent contractors exempt from workers' compensation coverage. Sonic stresses that *Borello* did not consider a refund for contributions pursuant to the Unemployment Insurance Act, but rather the applicability of workers' compensation laws.

However, in many aspects *Borello* echoes *Empire Star*. The Supreme Court noted that the distinction between independent contractors and employees in the common law context arose to limit one's vicarious liability for the misconduct of a person rendering service to the purported employer. The principal's supervisory power was crucial because the extent to which the employer had the right to control the details of the service rendered was highly relevant to whether the employer ought to be liable. Thus, the control test became the principal measure of a "servant's status for common law purposes." (*Borello, supra*, 48 Cal.3d at p. 350.)

However, *Borello* also observed: "[C]ourts have long recognized that the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements. While conceding that the right to control work details is the 'most important' or 'most significant' consideration, the authorities also endorse several 'secondary' indicia of the nature of a service relationship." (*Borello, supra*, 48 Cal.3d at p. 350.) The Supreme Court then enumerated the secondary factors, citing both *Tieberg* and *Empire Star*.[2] (*Borello*, at p. 351.)

The aspect of *Borello* that Sonic claims makes it inapplicable to the present case is the court's examination of the policy concerns behind the development of workers' compensation law. The court pointed out the distinction between tort policy and social legislation that justifies departures from common law principles when determining whether a worker is covered as an employee. Given this difference, the court concluded that under workers' compensation law, the control test must be applied with deference to the purposes of the protective legislation: "The nature of the work, and the overall arrangement between the parties, must be examined to determine whether they come within the 'history and fundamental purposes' of the statute." (*Borello, supra*, 48 Cal.3d at pp. 353–354.)

Sonic claims this deference allowed the *Borello* court to set a "far more liberal legal standard than existing under common law principles" when determining whether workers are employees or independent contractors. Not

---

[2] The court also noted a six-factor test developed in other jurisdictions to determine independent contractor status in light of the remedial purposes of workers' compensation legislation. Those factors include: the worker's opportunity for profit or loss depending on managerial skill; the worker's investment in equipment or materials, or employment of helpers; whether the service rendered requires a special skill; the permanence of the working relationship; and whether the service rendered is an integral part of the employer's business. The court noted "there are many points of individual similarity between these guidelines and our own traditional Restatement tests. [Citation.] We find that all are logically pertinent to the inherently difficult determination whether a provider of service is an employee or an excluded independent contractor for purposes of workers' compensation law." (*Borello, supra*, 48 Cal.3d at pp. 354–355.)

so. *Borello* set forth *exactly* the same secondary factors to be considered in addition to the issue of control that were enumerated in both *Empire Star* and *Tieberg*. The court explicitly declined to adopt "detailed new standards for examination of the issue," but stated that these factors "may often overlap those pertinent under the common law" and that "[e]ach service arrangement must be evaluated on its facts, and the dispositive circumstances may vary from case to case." (*Borello, supra,* 48 Cal.3d at p. 354.)

Sonic claims *Empire Star* stands for the proposition that the deferential public policy standard described in *Borello* only applies in a case concerning benefits and does not apply to a taxation analysis. In support, Sonic notes the *Empire Star* court's observation that "[t]he objects and purposes of the Unemployment Insurance Act are not limited to the raising of revenue. It is a remedial statute and the provisions as to benefits must be liberally construed for the purpose of accomplishing its objects. [Citation.] But there is no basis for the attorney general's contention that because the legislation confers benefits and also imposes taxes, the two parts of the law are inextricably connected. The taxing sections of the legislation are entirely separate from those concerning benefits, and although the benefits are paid from the amount collected as taxes imposed by the act, the provisions fixing liability for payments to the fund are to be considered accordingly." (*Empire Star, supra,* 28 Cal.2d at p. 43.)

Sonic reads this passage as rejecting any deference based on public policy toward finding coverage in cases determining a worker's status in an employment taxation case. We disagree.

The court in *Empire Star* delineated the significant substantive and procedural differences between the Unemployment Insurance Act's benefit and taxation components in response to the appellant commission's res judicata claims. The commission argued its prior administrative determination that the workers in question were entitled to benefits was res judicata in a later action brought by the employer to recover taxes paid. In the later action, the employer argued the workers were not employees under the Unemployment Insurance Act. The *Empire Star* court disagreed and determined the administrative benefits determination arose from the different procedural structure and was not res judicata in the latter taxation action. (*Empire Star, supra,* 28 Cal.2d at pp. 39–40, 46–48.) *Empire Star* did not hold that employment determinations in tax cases are to be treated differently than determinations in benefit cases.

Sonic argues: "The trial court erroneously relied upon the case of <u>Borello</u>, <u>supra</u>, and its progeny, for the proposition that the traditional common law test for employee status should <u>not</u> be applied to determine whether the

Drivers were independent contractors or employees for employment tax purposes." According to Sonic, *Borello* sets forth a control standard that is "vastly different" from that articulated in *Empire Star*. Neither statement is correct. Our review of cases construing the factors to be considered when determining whether a worker is an employee or an independent contractor supports the trial court's reliance on the Supreme Court's analysis in *Borello*. The trial court employed the proper legal standard in evaluating the evidence produced at trial.

## III

Sonic also argues the trial court's finding of employment status of its drivers is not supported by substantial evidence. The substantial evidence standard of review is well settled. In reviewing the evidence on appeal, we resolve all conflicts in favor of the prevailing party, and we indulge in all legitimate and reasonable inferences to uphold the finding if possible. Our power begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will support the finding. When two or more inferences can be reasonably deduced from the facts, we cannot substitute our own deductions for those of the trial court. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

In finding the drivers to be employees, the trial court, as instructed by *Empire Star*, *Tieberg*, and *Borello*, considered the extent to which Sonic controlled the work done by the drivers. The court rejected Sonic's claim that its failure to control the actual routes and speeds drivers chose when making deliveries denoted a lack of control. The court noted that the simplicity of the work (take this package from point A to point B) made detailed supervision, or control, unnecessary. Instead, Sonic retained all necessary control over the overall delivery operation. (*Borello, supra*, 48 Cal.3d at pp. 356–357.)

The court also rejected Sonic's claim that the drivers themselves controlled the hours they worked. As the court noted and the record reflects, the drivers testified they worked a regular schedule. Many of these schedules involved regular daily routes. Such regular schedules are consistent with employee status and reflect employer control. In addition, the court also found no inconsistency between employee status and the driver's discretion on when to take breaks or vacation.

Finally, the trial court discounted Sonic's claim that drivers actually turned down jobs, again denoting a lack of control by Sonic. At trial, a Sonic

manager testified that drivers, as a practical·matter, did not turn down jobs. Each driver testified he infrequently turned down jobs.

The trial court also considered the secondary factors enumerated in *Empire Star*, *Tieberg*, and *Borello*. As the court noted, the drivers were not engaged in a separate profession or operating an independent business.

The court found all Sonic required of a driver was a vehicle and automobile insurance; drivers did not make any major investments in equipment or materials. The evidence at trial revealed no driver purchased or leased any special vehicle to make Sonic deliveries.

As the court observed, many of the drivers delivered for Sonic for years. At trial, the drivers testified to lengthy tenures with Sonic, another factor inconsistent with independent contractor status.

The court noted the evidence was uncontroverted that Sonic's drivers were performing an integral and entirely essential aspect of Sonic's business. At trial, drivers testified they were required to use Sonic's forms in order to be paid. The drivers were paid on a regular schedule. Sonic's dispatchers sent the drivers to each delivery and provided deadlines. Drivers notified the dispatchers when the delivery was completed.

Several drivers testified Sonic encouraged them to wear Sonic uniforms. Sonic provided identification badges and placards for the driver's vehicles. Drivers delivered packages to Sonic's customers, not to their own customers. Sonic set the rates charged to customers, billed the customers, and collected payment. All of these facts, established at trial, reveal the drivers' deliveries were part of Sonic's regular business.

As to whether the parties believed they were creating an employer-employee relationship, Sonic contends its Contract with the drivers clearly established the drivers were independent contractors. However, the trial court rejected this claim on a variety of grounds.

The testimony at trial supports the trial court's critique of the evidence surrounding the Contract. Only one of the drivers who testified recalled signing a Contract. One of the drivers testified he drove without a Contract. Nor did Sonic enforce the Contracts. Drivers testified they did not, as the Contract requires, name Sonic as an additional insured on their insurance. Nor did the drivers obtain workers' compensation insurance as required by the Contract. In addition, the drivers testified Sonic failed to explain the legal and practical impacts of the Contract.

■ The evidence presented at trial supports the trial court's conclusion that the drivers operated as Sonic's employees in delivering packages. The testimony at trial revealed Sonic exerted control over the drivers to coordinate and supervise the company's basic function: timely delivery of packages. The secondary factors also point to a finding of employee status.[3]

## IV

■ Finally, Sonic argues the trial court abused its discretion in holding it liable for penalties under section 1127. Section 1127 authorizes the Department's director to impose a 10 percent penalty if an employer fails to comply with the contributions provisions of the code. The trial court found Sonic failed to meet its burden of proof on the question of refunds for penalties.

Sonic argues it acted in good faith in classifying the drivers as independent contractors. To support this assertion, Sonic essentially reargues the evidence in support of a finding of independent contractor status. Sonic reiterates the independent contractor status bestowed by the Contracts and argues *Millsap* supports its conclusion that the drivers were independent contractors.

The trial court considered the Contracts and all other indicia relating to the employment relationship between Sonic and the drivers. The trial court found the evidence adduced at trial clearly and unequivocally supported the Department's claim that the drivers operated as Sonic employees. Our review of the record supports the trial court's conclusion that the drivers were properly classified as employees for the purposes of the Unemployment Insurance Act. We find no abuse of discretion in the trial court's denial of Sonic's request for refund of penalties imposed under section 1127.

---

[3] We reject Sonic's claim that *Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425 [277 Cal.Rptr. 807] (*Millsap*) necessitates a finding that the drivers were independent contractors. In *Millsap*, a driver collided with a car and the injured passenger sued both the driver and the express company for which he was delivering packages. (*Id.* at pp. 428–429.) *Millsap* considered whether an employment relationship existed for tort purposes, not for taxation or compensation purposes. The *Millsap* court concluded the driver was an independent contractor, based in part on the fact that he was paid on a per route, "piecemeal" basis whenever he submitted invoices. (*Id.* at p. 432.) The court concluded that each time the driver picked up a package for delivery, there was a new "contract." (*Id.* at p. 432, fn. 3.) Here, in contrast, drivers testified they received their pay on regularly scheduled paydays. In addition, unlike in *Millsap*, the drivers in the present case drove regular routes and worked regular schedules. In sum, because of the context and its sufficiently distinguishable facts, *Millsap* does not dictate a finding that Sonic's drivers were independent contractors.

## DISPOSITION

The judgment is affirmed. The Department shall recover costs on appeal.

Scotland, P. J., and Davis, J., concurred.