[No. B219335. Second Dist., Div. Eight. Jan. 31, 2011.]

ADOLFO ARZATE et al., Plaintiffs and Appellants, v.
BRIDGE TERMINAL TRANSPORT, INC., Defendant and Respondent.

COUNSEL

Law Offices of Stephen Glick, Stephen Glick and Michael Anthony Jenkins for Plaintiffs and Appellants.

Morgan, Lewis & Bockius, George A. Stohner, Barbara A. Fitzgerald and Albert Huang for Defendant and Respondent.

OPINION

**GRIMES, J.—**

### SUMMARY

Plaintiffs Adolfo Arzate and Juan Ortiz, members of the International Brotherhood of Teamsters (Teamsters Union) who own their own trucks, brought this wage and hour class action on behalf of truck drivers who were paid by defendant Bridge Terminal Transport, Inc., to transport cargo between ports and the facilities of defendant's customers. Plaintiffs alleged they were defendant's employees, and asserted causes of action under the Labor Code for failure to pay minimum wages, failure to pay all wages due upon discharge, and failure to provide itemized wage statements, along with a cause of action for unfair business practices.

Defendant moved for summary judgment on the ground that plaintiffs were independent contractors, not employees. The trial court granted defendant's motion and entered judgment for defendant. We reverse the judgment.

## FACTS

The time period for this putative class action is November 2003 to December 2007. The evidence presented in support of and opposition to defendant's summary judgment motion established the following undisputed facts.

Defendant is in the business of arranging for the transportation of its customers' cargo between ports or terminals and the customers' facilities. While defendant did not own any trucks at any time relevant to this case, it holds itself out as a "common carrier by motor vehicle, engaged in the business of transportation of property under authority from the Federal Highway Administration . . . ." Defendant uses truck drivers like plaintiffs, who own their own trucks, to transport the cargo.

Plaintiffs are members of the Teamsters Union, which at all relevant times had a collective bargaining agreement (CBA) with defendant. The CBA covered the movement of intermodal traffic into and out of the ports of Los Angeles/Long Beach and San Diego, and governed defendant's "use of 'owner/operators' " domiciled in those ports and in San Bernardino. Plaintiffs were among a type of owner-operator described in the CBA as "employee owner/operators"—defined as "drivers who work exclusively for a single Employer on a regular basis and whose manner, means and details of work are determined by the Employer as well as the ends of work to be accomplished . . . ." A second "distinct type[]" of owner/operator was an "Independent Contractor Owner Operator[]"; it was "only that kind of owner/operators who do hauling work on an intermittent basis for different Employers."

All employee owner-operators were subject to the CBA, which provided that they "shall work exclusively for their Employer and for no other interests." Defendant presented declarations and deposition testimony stating this provision was not enforced, and therefore, "employee [o]wner-operators" had the opportunity to work for other companies, and "some actually did." Defendant did not identify any such instances. Plaintiffs declared that they knew of no other driver who worked for another company at the same time, they were never informed they could do so or that defendant would not enforce its right to prohibit them from doing so, and there was no reason for them to believe that defendant would not enforce that right.

Plaintiffs and defendant signed lease agreements under which each plaintiff as lessor leased the truck he owned to defendant as lessee, to be used for

hauling cargo for defendant. Among other things, the leases provided that the lessee—defendant—"shall have the exclusive possession, control and use of" the plaintiffs' trucks and "shall assume full responsibility for the operation of the equipment for the duration of the lease." The leases were for a term of 30 days, with automatic renewal after 30 days unless cancelled by either party on one day's written notice. Plaintiff Arzate and defendant signed a contract in May 2004 (along with a lease agreement signed on the same date) in which Arzate was denominated the "contractor" and which stated that the parties intended to create a relationship of independent contractor, not employer-employee. The contract stated that Arzate was "responsible for controlling the method and means by which the motor vehicle equipment is operated," but this was subject to defendant's "exclusive possession, control, and use of the equipment" and defendant's "complete responsibility for the operation of the equipment . . . ." This contract, too, was terminable on 24 hours' notice.

The CBA provided that where there is a conflict between the lease agreements and the CBA, the terms and conditions of the CBA "shall have precedence."

Plaintiffs paid all expenses (fuel, registration, maintenance, repairs, taxes, insurance) to maintain and operate their trucks, and selected which certified mechanics to use for maintenance and repairs. Defendant provided placards with the company name that were required to be affixed to the trucks.

In compensation, plaintiffs regularly received two checks from defendant. One check (for 75 percent of the total compensation) was paid for the lease of the truck, and the other check (for 25 percent of the total) was for plaintiffs' services as drivers (and was denominated in the CBA as "employee wages"). The second check was denominated a "[p]ayroll check," and defendant deducted federal, state, Social Security, Medicare and state "SUI/SDI" taxes from the plaintiffs' "gross pay." Defendant also issued W-2 wage and tax statements with respect to the amounts paid for plaintiffs' services which showed plaintiffs as employees. Defendant gave plaintiffs the option to participate in a health insurance plan provided through defendant by a third party, and the CBA required defendant to contribute 70 percent of the total monthly premium. Plaintiffs received a 1099 tax form for the payments on the lease of their trucks.

Defendant paid plaintiffs on a weekly basis "by the haul." Specifically, plaintiffs were paid "per haul" and "by the distance"; compensation would be greater for a haul driven a longer distance. Defendant also paid plaintiffs by the hour, at hourly rates specified in the CBA, for time spent waiting at a customer's facility, for delay time at berths and railroads, for time spent on

"placard/haz-mat problem[s]," for driver meetings, and for other specified activities. Drivers working on certain holidays were paid "one and one-half times the regular rate of pay . . . ."

Defendant did not require plaintiffs to use any particular type or color of vehicle, but required at least a three-axle vehicle or larger, and the defendant inspected and "okay[ed]" the trucks. Defendant did not provide any financial assistance for the purchase of plaintiffs' trucks. Defendant's director of West Coast operations declared that plaintiffs could have hired their own drivers to haul loads for defendant (and could have leased more than one truck to defendant), but the CBA expressly gave defendant "the exclusive right to determine who shall be hired."

Plaintiff Arzate documented the expenses he incurred related to the business use of his truck so that he could write the expenses off for tax purposes, and he continued to do so after he left defendant in July 2005. Plaintiff Ortiz stopped hauling loads for defendant in February 2004.

As to the actual truck driving, plaintiffs decided what route to take to get to the locations to which defendant dispatched them, but defendant expected them to take the shortest route. They used their own maps, chose when and where to take meal and rest breaks (within the confines of government regulations), and were not required to wear uniforms or adhere to any dress code or grooming policy. They decided where to park their trucks and had to pay a parking fee if they parked at defendant's yard.

Dispatchers at defendant's San Bernardino terminal communicated work orders to plaintiffs, telling plaintiffs when and where to pick up and deliver hauls, but dispatchers did not supervise the drivers. Defendant required plaintiffs to call dispatchers at specified times, including on completion of a haul and in the event of any delay beyond two hours at the terminal. Plaintiffs were required to call dispatchers every 45 minutes for instructions if delayed beyond three hours. Defendant did not instruct plaintiffs "on how to transport the freight," except that the hauling had to be done in compliance with federal and state law and regulations and within the time requested by defendant's customers. Plaintiffs were not involved "on a day-to-day basis" with securing the loads inside of the trailers, and were not involved in unloading the contents. Defendant billed the customers.

Plaintiffs were domiciled at defendant's San Bernardino terminal, which it closed in December 2006. San Bernardino was defendant's only West Coast terminal where union owner-operators were covered by a collective bargaining agreement. The work rules in the CBA required drivers to report to defendant's terminal at the assigned start time (7:00 a.m., or 7:45 a.m. if start

times were staggered), and to notify defendant one-half hour before the start time if a driver was unable to make the assigned start time. The rules also stated that drivers "will not be allowed to refuse a dispatch," and a driver who did so "will not be allowed to work the remaining part of that work day and could be subject to disciplinary action."

In practice, however, a driver who refused a dispatch would not be offered another load that day until such time (if any) as no other qualified drivers were available, and would not otherwise be disciplined for declining a dispatch. Drivers were not disciplined for failing to report for work, but the work rules stated that absenteeism would be considered excessive if a driver were absent five days or more per month, and tardiness would be considered excessive if it occurred more than three times per month. Arzate never personally observed a driver being disciplined. Arzate was given a copy of the CBA work rules by defendant (either by the dispatcher or another person in defendant's office who was in charge of log books). The CBA contained procedures governing defendant's discharge or suspension of drivers.

Loads were assigned in seniority order, with highest paying loads offered to the most senior drivers, based on the amount of time the drivers had been driving for defendant. Plaintiffs completed and turned in log books documenting the hauls they made; defendant instructed drivers how to complete the log books and periodically showed videotapes on safety matters. Defendant's dispatchers decided how many trips the driver would make each day, and defendant paid for government-mandated inspections of plaintiffs' trucks.

## DISCUSSION

The only issue on appeal is whether defendant established, as a matter of law, that plaintiffs were independent contractors. We conclude it did not.

### 1. *The Law*

The legal principles governing our review (which, on summary judgment, is de novo) are these.

■ "The determination of employee or independent-contractor status is one of fact if dependent upon the resolution of disputed evidence or inferences . . . ." (*S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 349 [256 Cal.Rptr. 543, 769 P.2d 399] (*S. G. Borello*).) The question is one of law if the evidence is undisputed. (*Ibid.*) "The label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced." (*Ibid.*)

■ California decisions applying statutes enacted for the protection of employees "uniformly declare that '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired . . . .' [Citations.]" (*S. G. Borello, supra,* 48 Cal.3d at p. 350.) But courts "have long recognized that the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements." (*Ibid.*) So, while the right to control work details "is the 'most important' or 'most significant' consideration, the authorities also endorse several 'secondary' indicia of the nature of a service relationship." (*Ibid.*) ■ Thus, " 'the right to discharge at will, without cause,' " is " '[strong] evidence in support of an employment relationship . . . .' " (*Ibid.*) Additional factors include "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Id.* at p. 351.)

The individual factors " 'cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' "[1] (*S. G. Borello, supra,* 48 Cal.3d at p. 351; see also *State Compensation Ins. Fund v. Brown, supra,* 32 Cal.App.4th at p. 202 ["the process of distinguishing employees from independent contractors is fact

---

[1] Several cases involving truck drivers demonstrate the point. (See *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 4, 10 [64 Cal.Rptr.3d 327] [affirming trial court's finding after a court trial that FedEx drivers were employees for purposes of Lab. Code, § 2802 and therefore entitled to reimbursement for work-related expenses]; *Air Couriers Internat. v. Employment Development Dept.* (2007) 150 Cal.App.4th 923, 926, 939 [59 Cal.Rptr.3d 37] [evidence presented at trial supported trial court's conclusion that drivers who delivered packages between businesses and to the airport operated as the company's employees in delivering packages; "[t]he testimony at trial revealed [the company] exerted control over the drivers to coordinate and supervise the company's basic function: timely delivery of packages"; "secondary factors also point to a finding of employee status"]; *State Compensation Ins. Fund v. Brown* (1995) 32 Cal.App.4th 188, 196 [38 Cal.Rptr.2d 98] [truck drivers for a broker who were paid a flat sum per job, received no benefits, were free to accept or reject any particular job, and who could and did work for competing brokers were independent contractors]; see also *Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425, 431–432 [277 Cal.Rptr. 807] [affirming summary judgment for company that paid driver (who used his own or his parents' car) to deliver packages to its customers; driver was "an independent contractor compensated on a piecemeal basis for deliveries made"].)

specific and qualitative rather than quantitative"; right of control "retains significance, but is no longer determinative"].)

## 2. *This Case*

Here, the trial court erred in finding no triable issue of material fact. At its heart, this case involves competing, if not necessarily conflicting, evidence that must be weighed by a trier of fact. (Cf. *S. G. Borello, supra*, 48 Cal.3d at p. 351 [factors " 'are intertwined and their weight depends often on particular combinations' "].) Defendant repeatedly emphasizes that it did not "control[] the manner and means by which [plaintiff] hauled loads," and if there were no evidence other than the evidence on "manner and means," defendant might carry the day. (As we have seen, plaintiffs drove their own trucks and paid the related expenses, could have leased more than one truck to defendant and hired other drivers, could decline a dispatch, decided when and where to take meal and rest breaks, and so on.)

But there are multiple other factors that must be considered and that do not weigh in favor of independent contractor status. Defendant executed the CBA with plaintiffs' union, which represented the owner-operators of trucks in the role of "employees" of the company. Defendant issued W-2 forms to plaintiffs, withheld taxes, and offered health plan benefits that included paying 70 percent of the cost. Defendant also paid hourly rates for some parts of plaintiffs' workday, such as waiting time, drivers' meetings, and so on. Defendant could terminate the lease agreements on 24 hours' notice. (See *S. G. Borello, supra*, 48 Cal.3d at p. 350 [" 'the right to discharge at will, without cause,' " is " '[s]trong evidence in support of an employment relationship' "].) And, while defendant asserts that its business is to "mak[e] arrangements between customers and the owner-operators of trucks for the movement of containers" and that plaintiffs "did not perform work that was part of [defendant's] regular business," that claim is belied by defendant's own documentation, which states, correctly, that defendant is a "common carrier by motor vehicle, engaged in the business of transportation of property . . . ." Thus, the work plaintiffs do "is a part of the regular business of the principal" (*S. G. Borello, supra*, 48 Cal.3d at p. 351), a factor suggesting employee status.

In short, a reasonable trier of fact, considering the totality of the evidence, might reasonably conclude that plaintiffs were employees of defendant. We make no such finding, of course, concluding only that the trial court erred when it ruled, as a matter of law, that plaintiffs were independent contractors.

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court with directions to vacate its order granting defendant's motion for summary judgment and to enter a new and different order denying the motion. Plaintiffs are to recover their costs on appeal.

Rubin, Acting P. J., and Flier, J., concurred.