Filed 1/30/15

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| KATHERINE JACKSON, | B252411 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC445597) |
| v. | |
| AEG LIVE, LLC et al., | |
| Defendants and Respondents. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Yvette M. Palazuelos, Judge.  Affirmed.

Reed Smith, Margaret M. Grignon, Zareh A. Jaltorossian, Paula M. Mitchell; Panish Shea & Boyle, Brian J. Panish, Kevin R. Boyle, Robert S. Glassman, for Plaintiff and Appellant.

O'Melveny & Myers, Marvin S. Putnam, Jessica Stebbins Bina, for Defendants and Respondents.

_____

Plaintiff Katherine Jackson, on behalf of herself and as guardian ad litem of Michael Joseph Jackson, Jr., Paris-Michael Katherine Jackson and Prince Michael Jackson II (collectively, the "Jacksons"), appeals from a judgment in favor of defendants AEG Live, LLC, AEG Live Productions, LLC, Brandon Phillips, and Paul Gongaware (collectively, "AEG") in this negligence action in connection with Michael Jackson's ("Michael") death. AEG hired Dr. Conrad Murray as Michael's personal physician for a concert tour. Michael died of acute propofol intoxication while under Dr. Murray's care. The Jacksons filed this action seeking to hold AEG liable on theories of negligence. The trial court summarily adjudicated causes of action for negligence and respondeat superior. The sole cause of action at trial was for negligence hiring, retention, and supervision. The jury found AEG hired Dr. Murray, however, he was not unfit or incompetent to perform the work for which he was hired.

On appeal, the Jacksons contend that the trial court erred by granting summary adjudication, because: (1) triable issues of fact exist as to whether AEG was negligent, because AEG's conduct created an increased risk of harm to Michael, AEG voluntarily undertook to provide protective services to Michael, and AEG had a duty arising by contract; and (2) triable issues of fact exist as to respondeat superior, because Dr. Murray was an employee of AEG, agent of AEG, or an independent contractor whose work presented a peculiar risk of harm. The Jacksons further contend the court erred by modifying the jury instruction and special verdict form on the negligent hiring, retention, and supervision claim because the instruction and verdict only address hiring, but not retention or supervision. Lastly, they contend the special verdict was legally insufficient to support the judgment. We conclude that the trial court did not err in summarily adjudicating negligence because AEG did not owe Michael a duty to refrain from exerting pressure over Dr. Murray, AEG did not undertake to provide protective services to Michael, and AEG owed Michael no duty arising out of the contract with Dr. Murray. The court also did not err in summarily adjudicating respondeat superior because the

2

undisputed facts establish that Dr. Murray was an independent contractor as a matter of law, AEG is not liable under the peculiar risk doctrine as an independent contractor, and Dr. Murray is not an agent of AEG. Furthermore, the trial court did not err in instructing the jurors with a modified jury instruction along with the special verdict form. Finally, we hold that the special verdict was legally sufficient. We affirm.

## PROCEDURAL HISTORY

On September 15, 2010, the Jacksons filed a complaint against AEG and other defendants alleging causes of action including (1) negligence,[1] (2) negligent hiring, training, and supervision, and (3) respondeat superior. On November 18, 2011, the Jacksons amended the original complaint by adding AEG Live Productions, LLC as a named defendant.[2] On March 8, 2012, the court also sustained defendant AEG Live Productions' demurrer to the complaint with leave to amend. On March 26, 2012, the Jacksons filed their amended complaint against AEG and other defendants alleging the same causes of action.[3]

**AEG's Motion for Summary Judgment or in the Alternative, Summary Adjudication**

On November 30, 2012, AEG brought a motion for summary judgment or, in the alternative, summary adjudication on the causes of action for negligence, negligent

---

[1] The Jacksons never asserted general negligence in the amended complaint. However, the trial court noted in its order for the motion for summary adjudication that the Jacksons' first cause of action alleged "breach of duties of care premised . . . upon general principles of negligence."

[2] AEG Live Productions is a wholly owned subsidiary of AEG Live, and AEG Live is itself a subsidiary of Anschutz Entertainment Group.

[3] The Jacksons dismissed Kenneth Ortega as a defendant.

hiring, retention, and supervision, and respondeat superior liability. As to the negligence claim, AEG argued that it did not assume a duty, under either the special relationship or negligent undertaking doctrines, to affirmatively protect Michael from Dr. Murray. AEG was not in a special relationship with Michael and the special relationship alleged by the Jacksons has no factual or legal support. The doctrine of negligent undertaking does not apply because the alleged undertaking is too broad and unsupported by the facts. The claim for negligent undertaking fails because there was no reliance on the undertaking or increased risk of harm. Moreover, the lack of foreseeability further dictates a finding of no duty. As to the negligent hiring, retention, and supervision claim, AEG contended it never hired, trained or supervised Dr. Murray, and AEG could not foresee the risk posed by the doctor. As to respondeat superior liability, AEG argued that Dr. Murray was not an employee because no agreement between AEG and Dr. Murray had been executed. And even if an agreement was executed, Dr. Murray was an independent contractor and AEG was therefore not liable.

Defendant Anschutz Entertainment Group and defendant Tim Leiweke moved concurrently for summary judgment in a separate motion based on grounds unique to them, however, they also incorporated by reference AEG's motion for summary judgment.


**The Jacksons' Opposition**


On February 11, 2013, the Jacksons filed an opposition to AEG's motion for summary judgment, arguing there were triable issues of fact. As to the negligence claim, the Jacksons contended there were facts that there was a special relationship between AEG and Michael because AEG controlled his finances and medical care and because Michael was particularly vulnerable. There was evidence that AEG undertook Michael's general medical care and specifically the provision of an assistant to Dr. Murray, and negligently performed those tasks. There are facts that AEG created an undue risk of

4

harm to Michael, and foreseeability is a question for the jury. As to the negligent hiring, retention, and supervision claim, the Jacksons argued that there were triable issues of fact as to whether AEG negligently hired Dr. Murray because they had an oral or implied-in-fact agreement with Dr. Murray and should have foreseen the particular risks posed by him. As to respondeat superior liability, the Jacksons further argued that there were triable issues of fact that Dr. Murray was an employee, not an independent contractor. Even if Dr. Murray was an independent contractor as a matter of law, AEG is liable for his negligent conduct because the medical services performed by Dr. Murray are inherently dangerous or involves a peculiar risk.

**AEG's Reply**

In its reply filed February 20, 2013, AEG argued that the opposition fails to establish any disputed issues of material fact and is based on inadmissible evidence. AEG contended that there was no special relationship because business dealings cannot establish such a relationship and the Jacksons admitted that Michael continued to see other doctors. AEG also stated that there was no evidence establishing Michael detrimentally relied on the special relationship. AEG further argued that the evidence established that AEG did not undertake to provide a medical assistant to Dr. Murray in Los Angeles. AEG reiterated that it did not hire Dr. Murray and could not foresee the danger he posed. Finally, AEG contended that it did not control the manner or means of Dr. Murray's work and that all applicable factors show that Dr. Murray was an independent contractor. The Jacksons' contention that Dr. Murray's work as a physician was inherently dangerous or involved a peculiar risk is contrary to the law.

**Trial Court's Rulings**

5

The trial court heard oral argument on February 25, 2013, and took the motion under submission. On February 27, 2013, the court denied summary judgment but granted summary adjudication as to the negligence and the respondeat superior causes of action. As to the negligence claim, the court held that the Jacksons cited no authority in which financial interactions or financial pressure is sufficient to create a special relationship. Moreover, the Jacksons did not present sufficient evidence to establish that AEG exercised complete control over Michael's medical welfare. The court further stated there was no negligent undertaking, AEG established that it made no specific undertaking, and that there was no reliance or increased risk of harm. The court found that a general undertaking to provide for "medical care" is too broad and not supported by the case law or facts. Moreover, given Michael's status and experience, exerting strong financial pressures is insufficient alone to create an undue risk of harm. As to respondeat superior liability, the court concluded that AEG's evidence established that Dr. Murray was an independent contractor, not an employee, because AEG had no control over the manner and means of Dr. Murray's work and there was no other basis on which to apply the doctrine of respondeat superior.

On February 28, 2013, the court granted defendant Anschutz Entertainment Group and defendant Leiweke's motion for summary judgment. The court entered judgment in favor of defendant Anschutz Entertainment Group and defendant Leiweke only. Negligent hiring, retention and supervision was the remaining cause of action that proceeded to trial against AEG.

**Trial Proceedings**

The trial commenced on April 2, 2013. On July 29, 2013, the Jacksons moved for leave to amend the amended complaint to conform to proof to add a general negligence cause of action. The trial court denied the motion to amend. On September 9, 2013, AEG moved for nonsuit, which was granted only as to defendants Phillips and

Gongaware. AEG Live was the sole remaining defendant on the negligent hiring, retention, and supervision cause of action as it commenced the defense.[4] On October 2, 2013, the jury returned a verdict in favor of AEG on the single cause of action, and the court entered judgment on November 13, 2013. On January 13, 2014, the court denied the Jacksons' motion for a new trial. The Jacksons filed a timely notice of appeal.

## STATEMENT OF FACTS[5]

Dr. Murray was initially referred to Michael by a patient's son, who was Michael's security guard. Dr. Murray began treating Michael back in 2006 while he was residing in Las Vegas, but Dr. Murray's treatment of Michael was intermittent. It was not until spring 2009 that Dr. Murray began treating him on a regular basis at Michael's Los Angeles residence.

### AEG/Dr. Murray Contract

On January 26, 2009, AEG and Michael, on behalf of himself and the Michael Jackson Company, LLC (MJC), entered into an agreement for AEG to produce and promote Michael's *This Is It* tour. Under the tour agreement, AEG would advance the costs associated with producing and promoting the tour, as well as advancing substantial sums to the MJC to provide Michael with cash, pay off certain debts, rent his home, and potentially buy a second home. These production advances, advances payable to the MJC, and production costs were to be recouped from Michael's share of the tour

---

[4] The parties stipulated that AEG Live and AEG Live Productions could be treated as a single defendant for purposes of verdict and instructions.

[5] The Statement of Facts is limited to the evidence produced at summary adjudication, as the evidence admitted at trial has no bearing on the issues presented in this appeal.

proceeds or, if the tour did not generate sufficient proceeds to cover such advances and costs, repaid by Michael and the MJC. Michael had the right to select his own touring staff. As with all production costs, the salaries of his touring staff were advanced by AEG, but Michael ultimately was responsible for the payments.

In April 2009, Michael's assistant called Dr. Murray and stated that Michael wanted Dr. Murray to be on tour with him in England. Dr. Murray responded, "Well, I need more details about that," and the conversation ended. Shortly thereafter, Dr. Murray got a call from Michael "telling [him] how elated he was that [Dr. Murray] was going to join the trip."

In late April or early May 2009, Michael told Paul Gongaware, the co-CEO of Concerts West, a division of AEG Live that handles concert tours, he wanted to bring his personal physician Dr. Murray on the tour. Gongaware tried to convince Michael that a London-based physician would be preferable due to logistical and licensing issues. However, Michael insisted on having Dr. Murray. Gongaware recalls Michael specifically stating, "This is what I want. I want Dr. Murray." After speaking with Michael, Gongaware contacted Brandon Phillips, AEG Live's President and CEO, about Michael's request. Phillips spoke to Michael, explaining that it made logistical and economic sense to get a physician in London. However, Michael was very firm and indicated that he already selected his touring physician, Dr. Murray, who was his long-term personal physician. Phillips then told Michael he would have Gongaware reach out to Dr. Murray to negotiate, on Michael's behalf, the best terms for Dr. Murray to join the tour. Gongaware ultimately agreed that AEG would facilitate contract negotiations with Dr. Murray, as it had done for other members of Michael's touring staff. Michael gave Gongaware Dr. Murray's telephone number and asked him to contact Dr. Murray.

When Gongaware contacted Dr. Murray in late April or early May 2009, Dr. Murray told him that he already knew Michael intended to bring him on tour. Dr. Murray demanded that he and his company, GCA Holdings, LLC, be paid $5 million for his services because he had to close down four clinics and lay off his employees. After

8

Gongaware told Dr. Murray that figure was unreasonable, Gongaware relayed Dr. Murray's demand to Michael. Michael directed Gongaware to counteroffer $150,000 a month. Gongaware followed Michael's instruction and presented the counteroffer to Dr. Murray as an "offer directly from the artist." Dr. Murray expressed his willingness to negotiate a contract at that price and told Gongaware that his contract should include a provision for a residence in London close to Michael's, and he would need some medical equipment and an assistant in London.

At Gongaware's request, Timm Woolley, an accountant on Michael's *This Is It* tour, contacted Dr. Murray on May 8, 2009, to gather preliminary information from him. Woolley understood that Dr. Murray was Michael's primarily care physician. On the phone and memorialized in an email later that day, Woolley and Dr. Murray discussed contact information, his likely mode of travel and accommodations, his potential need for CPR machines and an assistant in London, potential insurance options, and his fees.

On May 15, 2009, Dr. Murray responded to Woolley by asking him to send a draft of a possible contract for his lawyer's review. Dr. Murray also stated, "As for good faith with my client I am sure that you are aware that my services are already fully engaged with Mr. Jackson." On May 28, 2009, Woolley received another email from Dr. Murray, asking for a good faith payment of the fees that ultimately would be due under the planned agreement. Woolley replied the same day to advise him that no payment could be made because "AEG policies dictate that payments can only be made under a fully-executed agreement." Woolley also stated, "The legal department had not yet completed the agreement which is rather specialised [*sic*] since it is a rare event that a physician is engaged to accompany a touring artist."

Kathie Jorrie, outside legal counsel for AEG, was directed by Woolley to draft a proposed independent contractor agreement that would provide for Dr. Murray to accompany Michael on the tour. Like Woolley, Jorrie understood that Dr. Murray was a physician that Michael had requested and directed AEG to reach out to the doctor to discuss and draft a possible agreement.

On June 15, 2009, Jorrie emailed the first draft, which was titled "Independent Contractor Agreement" to Woolley for his review. The next day, Woolley emailed Dr. Murray the draft and asked for his "input and comments." The draft agreement included a condition precedent: the parties would have no rights or obligations to one another unless and until Michael personally signed the agreement, giving his written confirmation that he had requested AEG to engage Dr. Murray, on Michael's behalf and at Michael's expense, on the terms set forth therein. This provision was not standard to AEG's tour contracts and was added because of the unique personal relationship between Michael and Dr. Murray. This provision remained in each subsequent draft.

On June 18, 2009, Dr. Murray called Jorrie to discuss the draft. He advised her that Woolley had sent the draft contract to him and explained that he wanted to make changes to various terms in the draft agreement. Among other things, they discussed who the contracting parties and required signatories would be and whether Dr. Murray would hire someone to assist him in London. Jorrie inquired as to why Dr. Murray needed to have a CPR machine in London and Dr. Murray explained he needed a CPR machine in case of an emergency given Michael's age and the strenuous performance he would be putting on in London. Dr. Murray told Jorrie this was customary. Dr. Murray made it clear to Jorrie that he wanted the CPR machine and the medical assistant in London, not Los Angeles. However, Dr. Murray never asked for specific equipment to be delivered to him, and he had yet to select a medical assistant. Dr. Murray also assured Jorrie that he was licensed to practice medicine in California, Texas, Nevada and Hawaii.

After speaking with Dr. Murray, Jorrie revised the draft agreement to reflect the various changes and additional issues discussed. On June 19, 2009, Woolley emailed the revised version to Dr. Murray for his further review and comment.

On June 23, 2009, Dr. Murray called Jorrie regarding further revisions to the draft contract's terms, including: (1) changing the contract's end date from September 30, 2009, to March 6, 2010, so that Dr. Murray would stay on during a break in the tour; (2) changing the payment provisions so that Dr. Murray would receive the full $150,000 per

10

month even during the break in the tour, when Michael was not performing; (3) changing the contract's start date to make it retroactive, so the term of payment would begin on May 1, 2009; and (4) changing a provision stating that Dr. Murray would perform "services reasonably requested by the Producer" to say that he would perform "services reasonably requested by the Artist [Michael]."[6] Dr. Murray stated that he reviewed the entire draft agreement with Michael.

On June 24, 2009, Jorrie emailed Dr. Murray the latest revised draft for his review and comment. The draft stated the tour is "scheduled to take place at the O2 Arena in London, England between approximately July 13, 2009 and March 6, 2010 . . . . At [Michael's] request, [AEG] has agreed to retain the services of Dr. Murray for the benefit of [Michael] throughout the duration of the Concert Series . . . ." It further stated that "Dr. Murray will provide general medical care" to Michael as of May 1, 2009 and will continue through Michael's last performance in the concert series. "Such Services will be administered professionally and with the greatest degree of care to be expected from similarly situated members in the medical field. Such services shall include, without limitation, tending to [Michael]'s general medical needs and assisting and treating [Michael] in case of a medical emergency. Dr. Murray shall also provide such other services as are reasonably requested by [Michael] from time to time during the term hereof. Dr. Murray shall perform such services in London, England during any time periods in which [Michael] is located in London, and at all other times during the [t]erm [of the agreement], the Services will be performed in the United States." AEG will provide Dr. Murray with medical equipment requested by Dr. Murray and approved by AEG. The equipment will include a CPR machine, saline, catheters, needles, a gurney and other mutually approved necessary medical equipment. AEG will also pay a mutually approved fee for a qualified assistant medical person selected by Dr. Murray and approved by AEG. The draft provided that Dr. Murray "[p]erform the Services

---

[6] Jorrie forgot to change this provision in the subsequent draft to reflect that Dr. Murray would perform the services requested by Michael, not by AEG.

reasonably requested by [AEG]" and "[p]resent to [AEG] within two (2) weeks from the date of this Agreement documented proof of any and all licenses required for Dr. Murray to practice medicine in the United States and to perform the Services under this Agreement." Dr. Murray must also present to AEG no later than July 3, 2009, documented proof of any and all licenses required for Dr. Murray to practice medicine in the United Kingdom. Dr. Murray was required to maintain, at his sole expense, commercial general liability insurance, business auto liability insurance, workers compensation insurance, and medical malpractice insurance. Dr. Murray could be terminated for cause by AEG, however, Dr. Murray could be terminated immediately if Michael decides for any reason that he no longer wants or needs the services of Dr. Murray. In addition to the condition precedent requiring Michael's signature confirming that he requested AEG to engage Dr. Murray as his personal physician on the *This Is It* tour, the signatories to the contract were AEG Live Productions on the one hand, and GCA Holdings and Dr. Murray on the other.

If Dr. Murray approved of the latest version of the agreement, Jorrie instructed him to "print the pdf, sign it and return your signature to me by pdf (via email) or by fax." Later that evening, Dr. Murray faxed Jorrie a copy of the draft agreement that he had signed. Jorrie forwarded the signed contract to AEG. Neither Michael nor an AEG authorized representative had signed, or ever signed, the contract.

**AEG Executives Met Dr. Murray in June 2009**

AEG met with Dr. Murray in-person, along with Michael, on two separate occasions, one or around June 14, 2009, and another on June 20, 2009. Outside of the two in-person meetings, Phillips spoke to Dr. Murray on the phone on one occasion.

On June 14, 2009, Kenneth Ortega, the producer and director of *This Is It* tour, emailed Gongaware inquiring whether he was aware that Dr. Murray did not allow Michael to attend rehearsals the day before. Ortega then recommended, "Without

12

invading [Michael's] privacy, it might be a good idea to talk with his Doctor to make sure everything [Michael] requres [*sic*] is in place." Gongaware responded by email and stated that he requested a face-to-face meeting with Dr. Murray and "[w]e want to remind him that it is AEG, not [Michael] who is paying his salary. We want him to understand what is expected of him." The following day, Ortega responded that Michael is habitually late to rehearsals and that he needs nourishment guidance, and physical therapy for his fatigued muscles and injuries.

On or around June 14 2009, Phillips met with Dr. Murray and Michael to discuss concerns that had been raised by the tour staff about Michael's stamina, nutrition, and rehearsal attendance. Both Michael and Dr. Murray repeatedly assured Phillips that Michael was in excellent health. This was the first time Phillips met Dr. Murray.

On June 17, 2009, Gongaware sent an email stating that a therapist and a nutritionist should be hired for Michael. Leiweke recommended a candidate and forwarded his information to Gongaware.

On June 19, 2009, both Gongaware and Phillips were notified at Ortega's request that Michael was sent home from rehearsals that day and Ortega "was concerned [Michael] would embarrass himself on stage, or worse yet — get hurt."

In a June 20, 2009 email to Phillips, Ortega recommended a therapist for Michael and that Michael should be psychologically evaluated. Moreover, Ortega did not feel that Michael "is ready for this based on his continued physical weakening and deepening emotional state." Michael appeared "frightened it's all going to go away." Phillips stated in an email to Gongaware, ". . . I am not sure what the problem is. Chemical or physiological?" Phillips further stated in a subsequent email that Dr. Murray is "not a psychiatrist so he is was not sure how effective he would be at this point."

On June 20, 2009, Phillips, Ortega, Dr. Murray and Michael scheduled a meeting around 2:00 p.m. at Michael's residence. The purpose of the meeting was to address Ortega's concerns about Michael's health and his lack of focus. However before the meeting, Phillips called Dr. Murray to discuss the content of Ortega's previous email.

13

Phillips then responded to Ortega's earlier email stating that "it is critical that neither you, me, or anyone around this show become amateur psychiatrists or physicians. I had a lengthy conversation with Dr. Murray, who I am gaining immense respect for as I get to deal with him more. He said that Michael is not only physically equipped to perform and, that discouraging him to, will hasten his decline instead of stopping it . . . . This doctor is extremely successful (we check everyone out) and does not need this gig so he totally unbiased and ethical."

At the scheduled meeting, Ortega reiterated what he wrote in his email about Michael's physical condition and his mental state. Dr. Murray assured Ortega and Phillips that Michael was fine physically and he admonished Ortega for being an amateur physician. Dr. Murray further told Ortega, "You direct the show. I'll be responsible for Michael's health." They "all agreed on a schedule that works for both [Ortega] and Michael. Phillips felt it was a "a very productive, solid meeting" with Ortega, Dr. Murray, Michael and himself.

At the June 23, 2009 rehearsal, Michael "was like a different person. [¶] [¶] [T]here was clarity and energy and commitment and a readiness, and it awoke -- it awakened the whole room, and everyone was aware of it." In an email that day, Woolley wrote that "Ortega has responsibility for the show content & structure in consultation with [Michael] . . . Phillips and Dr. Murray are responsible for [Michael's] rehearsal and attendance schedule." On June 24, 2009, Michael went to his scheduled rehearsal.

In an email between Phillips and Gongaware, they agreed that Dr. Murray should be involved in arranging Michael's insurance physical in London on June 6, 2009, and accompany Michael to this appointment.

At Michael's Los Angeles residence on June 25, 2009, Michael complained to Dr. Murray that he could not sleep. Earlier that day, Michael had to cancel rehearsal and Dr. Murray was worried "everything is going to be thrown off, thrown back; and we have very little time to take the show to England." Michael said to Dr. Murray that he would "like to have some milk. [¶] Please, please give me some milk so that I can sleep,

14

because I know that this is all that really works for me." Dr. Murray knew Michael was referring to propofol and administered it to him. Shortly thereafter, Michael died from what was later determined as a fatal dose of propofol.[7] Dr. Murray had been ordering propofol for Michael starting in early April and continued purchasing it up until Michael's death. On November 7, 2011, a jury convicted Dr. Murray of involuntary manslaughter (Pen. Code, § 192, subd. (b)) in connection with Michael's death.

**Evidence of Michael's Prior Propofol Use**

Michael had an extensive history of propofol use dating back to the early 1990's. Michael was warned by several medical providers that propofol or any "intravenous medicine that would put [him] to sleep" was dangerous and potentially life threatening. Despite this, Michael sought propofol from various the medical providers aside from Dr. Murray during the months leading up to his death. Michael saw other health care providers for different medical reasons during this time.

**Dr. Murray's Police Interview**

During an interview of Dr. Murray conducted by the Los Angeles Police Department after Michael's death, Dr. Murray discussed his employment relationship with AEG. He stated Michael "asked me to be on his team. I was talking to [Michael] himself. He offered me employment, and I was of the opinion that he would be my employer directly. Subsequently to accepting that, I – I realized that AEG would be the one paying for the salary that he requested. So that was their arrangement as far as what they would finance me. So I am an employee for Michael Jackson but paid through

---

[7] According to an autopsy report, Jackson died of acute propofol intoxication. Propofol is an intravenously administered hypnotic drug, which is commonly used to induce and maintain general anesthesia in a hospital setting.

15

AEG."

Dr. Murray also told police it was Michael's idea for Dr. Murray to administer propofol to him. Michael discussed his prior use of propofol with Dr. Murray and told the police "the doctors allowed [Michael] to infuse it himself."

## DISCUSSION

## Summary Adjudication

The Jacksons contend on appeal that the trial court erred in summarily adjudicating negligence and respondeat superior. We disagree and explain below.

### A. Standard of Review

"'[T]he party moving for summary [adjudication] bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law.' (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) 'Once the [movant] has met that burden, the burden shifts to the [party opposing the motion] to show that a triable issue of one or more material facts exists as to that cause of action . . . .' (Code Civ. Proc., § 437c, subd. (p)(1) & (2); see also *Aguilar, supra,* 25 Cal.4th at p. 850.) . . . When a summary [adjudication] has been granted, we review the trial court's decision de novo, 'considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports.' (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.)" (*MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.* (2010) 187 Cal.App.4th 766, 776-777.)

"The party opposing the summary [adjudication] must make an independent showing by a proper declaration or by reference to a deposition or another discovery

product that there is sufficient proof of the matters alleged to raise a triable question of fact if the moving party's evidence, standing alone, is sufficient to entitle the party to judgment. [Citations.] To avoid summary [adjudication], admissible evidence presented to the trial court, not merely claims or theories, must reveal a triable, material factual issue. [Citation.] Moreover, the opposition to summary [adjudication] will be deemed insufficient when it is essentially conclusionary, argumentative or based on conjecture and speculation. [Citations.]" (*Wiz Technology, Inc. v. Coopers & Lybrand* (2003) 106 Cal.App.4th 1, 10-11.) A genuine issue of fact exists if, and only if, the evidence would allow a reasonable juror to find the underlying fact in favor of the party opposing summary adjudication. (*Aguilar, supra,* 25 Cal.4th at p. 850.)

## B. Negligence

The Jacksons argue that the court erred in summarily adjudicating negligence because there are triable issues of material fact as to whether AEG owed a duty to Michael based on evidence that: (1) AEG increased the risk of harm to Michael; (2) AEG voluntarily undertook a duty to provide protective services to Michael; and (3) AEG's contract with Dr. Murray gave rise to a duty of care toward Michael.

### 1. Applicable Law of Negligence

"'Actionable negligence is traditionally regarded as involving the following: (a) a *legal duty* to use due care; (b) a *breach* of such legal duty; (c) the breach as the *proximate or legal cause* of the resulting injury.' (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 732, p. 60, and cases cited.) 'Under the duty approach [to negligence], conduct is negligent when it creates an unreasonable risk of harm to some *general class of persons.* If the plaintiff is not within that class toward whom the defendant is negligent, the injury does not give rise to liability. (See Rest.2d, Torts § 281.)' (6 Witkin, *op. cit.*

17

*supra,* § 733, p. 61.) [¶] '. . . [E]very case is governed by the rule of general application that all persons are required to use ordinary care to prevent others from being injured as the result of their conduct.' (*Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [(*Weirum*)]; Civ. Code, § 1714.) Exceptions to this rule may be justified only by clear public policy. (*Rowland v. Christian* (1968) 69 Cal.2d 108, 112.) [¶] 'While breach of duty and proximate cause normally present factual questions, the existence of a legal duty in a given factual situation is a question of law for the courts to determine. [Citation.]' (*Andrews v. Wells* (1988) 204 Cal.App.3d 533, 538 [(*Andrews*)].)" (*Jackson v. Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1837-1838.)

"'As Witkin notes, "[t]he 'legal duty' of care may be of two general types: (a) the duty of a person to use ordinary care in activities from which harm might reasonably be anticipated[;] (b) [a]n affirmative duty where the person occupies a particular relationship to others. In the first situation, he is not liable unless he is actively careless; in the second, he may be liable for failure to act affirmatively to prevent harm." (6 Witkin, [Summary of Cal. Law, *op. cit. supra,* Torts], § 732, p. 61; citations omitted.) Thus, in considering whether a person had a legal duty in a particular factual situation, a distinction must be made between claims of liability based upon misfeasance and those based upon nonfeasance. "Misfeasance exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk. Conversely, nonfeasance is found when the defendant has failed to aid plaintiff through beneficial intervention . . . . [L]iability for nonfeasance is largely limited to those circumstances in which some special relationship can be established. If, on the other hand, the act complained of is one of misfeasance, the question of duty is governed by the standards of ordinary care . . . . " (*Weirum,* [*supra,*] 15 Cal.3d [at p.] 49 []; see also *Clarke v. Hoek* [1985] 174 Cal.App.3d [208,] 215-216.)' (*Andrews, supra,* 204 Cal.App.3d at pp. 538-539.)" (*Jackson v. Ryder Truck Rental, Inc., supra,* 16 Cal.App.4th at p. 1838.) "However, foreseeability of the risk is a primary consideration in establishing the element of duty." (*Weirum, supra,* at p. 46.)

## 2. Increased the Risk of Harm

The Jacksons assert that AEG breached its duty of ordinary care to not increase the risk of harm to Michael's health. Their contention essentially is that the duty of ordinary care in this case included a duty not to pressure Dr. Murray to protect AEG's interests over Michael's health and safety, particularly in light of the conflict of interest created by the hiring relationship and AEG's knowledge of Michael's deteriorating health. We agree with the trial court's conclusion that AEG did not have a duty to refrain from pressuring Dr. Murray.

As noted above, "all persons are required to use ordinary care to prevent others from being injured as a result of their conduct." (*Weirum, supra,* 15 Cal.3d at p. 46.) To determine if there is a duty in a particular case, we consider whether the defendant created an unreasonable risk of harm to others. (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 533.) "[F]oreseeability of the risk is a primary consideration in establishing the element of duty." (*Weirum, supra,* at p 46.) A person is entitled to assume others will not act negligently, but only to the extent the intervening conduct could not be anticipated. (*Id.* at p. 47.) "'Courts . . . have invoked the concept of duty to limit generally "the otherwise potentially infinite liability which would follow from every negligent act . . . ."' [Citation.]" (*Coldwell Banker Residential Brokerage Co. v. Superior Court* (2004) 117 Cal.App.4th 158, 164.)

To determine whether AEG had a duty to refrain from pressuring Michael's doctor, we must consider whether, under the uncontradicted facts, AEG's actions created an unreasonable risk of harm. It is not foreseeable that pressuring a doctor to keep his patient healthy in order to meet his contractual obligations would result in the doctor supplying the patient with an unusual, powerful, and dangerous sedative. AEG was not aware Dr. Murray was taking extreme measures in his treatment of Michael, such as administering propofol. AEG wanted Dr. Murray to keep Michael healthy and able to

19

perform, not put his health at risk. In fact, AEG's concern over Michael's overall health and stamina led to subsequent meetings with AEG, Dr. Murray and Michael. Dr. Murray's decision to use a dangerous medication under circumstances with lax oversight could not have been anticipated by AEG as a result of its instructions to maintain Michael's overall health.

Even considering the various interests of AEG and Dr. Murray, it was not foreseeable from AEG's directions to keep Michael healthy and able to attend rehearsals that Dr. Murray would prescribe a dangerous medication that jeopardized Michael's health. AEG did not direct Dr. Murray to use any means necessary to ensure Michael attended rehearsals. After the last meeting with Dr. Murray and Michael, AEG was looking for a nutritionist or a physical therapist to help Michael stay healthy in preparation for the upcoming tour. It was not foreseeable to AEG, even under its heightened influence, that its directions to keep Michael healthy would cause Dr. Murray to provide treatment that put Michael at risk. The Jacksons have not provided citation to any authority suggesting otherwise.

AEG's knowledge of Michael's deteriorating health and any drug dependency issues did not increase the foreseeability that his doctor would take extreme and dangerous measures. In fact, the company might assume that Dr. Murray would take precautions and assist Michael in avoiding medications that put him at risk. AEG's instructions to Dr. Murray did not create an unreasonable risk of harm to Michael. The trial court correctly found AEG did not under the undisputed facts have a duty to refrain from pressuring Dr. Murray under the circumstances of this case.

### 3. Negligent Undertaking to Provide Protective Services

The Jacksons contend there is evidence to support a triable issue of whether AEG voluntarily undertook a duty to provide protective services to Michael. Specifically, the Jacksons contend AEG undertook to provide medical services to Michael by hiring Dr.

20

Murray, and also undertook to provide Dr. Murray with CPR equipment and a medical assistant. We agree with the trial court that there is no triable issue of fact as to a negligent undertaking.

"Our cases establish that a volunteer who, having no initial duty to do so, undertakes to provide protective services to another, will be found to have a duty to exercise due care in the performance of that undertaking if one of two conditions is met: either (a) the volunteer[']s failure to exercise such care increases the risk of harm to the other person, or (b) the other person reasonably relies upon the volunteer[']s undertaking and suffers injury as a result." (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 249 (*Delgado*), fn. omitted.) "'The foundational requirement of [negligent undertaking] is that in order for liability to be imposed upon the actor, he must *specifically* have undertaken to perform the task that he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative duty to perform that undertaking carefully.' [Citation.]" (*Artiglio v. Corning, Inc.* (1998) 18 Cal.4th 604, 614-615, italics added.) "[F]oreseeability remains a highly relevant factor— even in cases in which a legal duty is found . . . ." (*Delgado, supra,* at p. 250.) It is important to "note that the negligent undertaking doctrine is not favored in the law, and many cases discussing its principles . . . have refused to apply it." (*Rotolo v. San Jose Sports and Entertainment, LLC* (2007) 151 Cal.App.4th 307, 336, disapproved of on other grounds by *Verdugo v. Target Corp.* (2014) 59 Cal.4th 312, 328-329.)

The Jacksons heavily rely on *Coffee v. McDonnell-Douglas Corp.* (1972) 8 Cal.3d 551 (*Coffee*), to support their contention that AEG owed Michael a duty when it undertook to provide medical services to Michael by retaining Dr. Murray as his personal physician. In *Coffee, supra,* at page 559, the defendant undertook to "examine plaintiff so as to ascertain his physical fitness for duties as a pilot." The examination consisted of a review of the plaintiff's medical history, extensive X-rays, urinalysis, an electrocardiogram and a blood test. (*Id.* at p. 554.) The kind of medical examination required in *Coffee* was very specific, while the alleged undertaking of "medical care" is

21

vague and exceptionally broad. Such a broad duty is not only contrary to the case law, but the evidence demonstrates AEG did not undertake Michael's medical care in its entirety. AEG did not prevent Michael from seeing other doctors, and Michael in fact did so during the months leading up to his death. Thus, the trial court properly found there was no evidence that AEG undertook Michael's medical care.

The Jacksons further contend that AEG specifically undertook to provide Dr. Murray with CPR equipment and a medical assistant, and AEG negligently performed these tasks by failing to provide the equipment and assistant. The evidence relied upon by the Jacksons demonstrates that Dr. Murray made it clear to AEG that he wanted a CPR machine and the medical assistant in London, not Los Angeles. The draft contract provides for "a qualified assistant medical person" selected by Dr. Murray and approved by AEG. The contract also provided for "medical equipment requested by Dr. Murray" and approved by AEG. The medical equipment included a CPR machine. Dr. Murray never asked for specific equipment to be delivered to him in Los Angeles and only noted the need for a CPR machine in London. Additionally, Dr. Murray had yet to select a medical assistant. AEG was only to approve of such requests, yet no request was made during Dr. Murray's care of Michael in Los Angeles. We agree with the trial court that there is no triable issue of fact as to whether AEG undertook a specific duty to provide a CPR machine or a medical assistant in Los Angeles. Therefore we will not address whether the Jacksons established Michael's reliance or increased risk of harm. (See *Delgado, supra,* 36 Cal.4th at p. 249.)

### 4. Contractual Duty

The Jacksons assert for the first time on appeal that AEG owed a duty of care to Michael arising from AEG's contract with Dr. Murray. The Jacksons identify AEG's alleged contractual duty to provide CPR equipment and a qualified medical assistant to Dr. Murray. Additionally, AEG's failure to provide the proper equipment and medical

assistant, and the exertion of financial pressure on Dr. Murray could foreseeably cause Dr. Murray to deviate from the requisite standard of care. We disagree.

A special relationship may arise out of a contractual duty. (*Seo v. All-Makes Overheard Doors* (2002) 97 Cal.App.4th 1193, 1203 (*Seo*), citing 6 Witkin, Summary of Cal. Law (9th ed. 1990) Torts, § 859, p. 223.) "If a special relationship arises out of a contractual duty, the duty is owed not only to the parties to the contract but also to those persons intended to be benefited by the performance of the contract. [Citation.]" (*Seo, supra,* at p. 1203.) "'The rule which imposes this duty is of universal application as to all persons who by contract undertake professional or other business engagements requiring the exercise of care, skill and knowledge; the obligation is implied by law and need not be stated in the agreement [citation].' (*Roscoe Moss Co. v. Jenkins* (1942) 55 Cal.App.2d 369, 376; see also *Kuitems v. Covell* (1951) 104 Cal.App.2d 482, 485.)" (*North America Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 774, fn. omitted.)

As stated earlier, AEG did not fail to provide CPR equipment and a qualified medical assistant to Dr. Murray, because he requested a CPR machine for London and had not yet chosen a medical assistant. AEG was not obligated under the contractual agreement to provide the equipment or assistant absent Dr. Murray's request. The Jacksons present no evidence that AEG exerted financial pressure on Dr. Murray to ensure Michael's attendance at rehearsals. They point to one private email from one AEG employee to another stating that they should remind Dr. Murray that it is AEG paying him, not Michael. There is no supporting evidence that this message or a similar one was conveyed to Dr. Murray outside of this email exchange. It was not foresseeable that Dr. Murray would deviate from the requisite standard of care. Because the Jacksons fail to establish a trial issue of material fact under all three theories of negligence, we hold the trial court did not err in summarily adjudicating negligence.

23

## C. Respondeat Superior[8]

The Jacksons contend that the trial court erred in summarily adjudicating the issue of respondeat superior because there are triable issues as to whether Dr. Murray was an employee of AEG, and therefore AEG is vicariously liable for Dr. Murray's negligence. Even if Dr. Murray was an independent contractor, the Jacksons argue, there are triable issues as to whether AEG is liable for Dr. Murray's negligent acts under the peculiar risk doctrine or agency theory. We disagree with the Jacksons' contentions and explain below.

### 1. Applicable Law

"Under the doctrine of respondeat superior, an employer is vicariously liable for his employee's torts committed within the scope of the employment." (*Perez v. Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 967.) "[T]he employer's liability extends beyond his actual or possible control of the employee to include risks inherent in or created by the enterprise." (*Id.* at p. 698.) "'[T]he inquiry should be whether the risk was one "that may fairly be regarded as typical of or broadly incidental" to the enterprise undertaken by the employer. [Citation.]' [Citation.]" (*Ibid.*) "It is also settled that an employer's vicarious liability may extend to willful and malicious torts of an employee as

---

[8] In oral argument, the Jacksons' counsel called the court's attention to California Supreme Court cases *Hendy v. Losse* (1991) 54 Cal.3d 723 (*Hendy*), *Coffee, supra,* 8 Cal.3d 551, and *Rannard v. Lockheed Aircraft Corp.* (1945) 26 Cal.2d 149 (*Rannard*), to support their contention that a defendant may be vicariously liable for the negligence of an employee or agent physician. AEG does not dispute this contention, but disagrees as to its application in this case. Additionally, we conclude the referenced cases are irrelevant because *Hendy* and *Coffee* did not involve an analysis of respondeat superior. Also, *Rennard* focused on the sufficiency of the pleadings and because we are at the summary adjudication stage, we hold this case immaterial to the case at hand. The cases do not further the Jacksons' argument to support a finding of AEG's liability under the doctrine of respondeat superior, and therefore we decline to address them.

well as negligence.  [Citation.]"  (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1004.)

### 2.  Independent Contractor

The Jacksons contend the evidence establishes a triable issue of material fact that Dr. Murray was AEG's employee because AEG had the right to exercise control over Dr. Murray's work and attempted to exercise such control.  We agree with the trial court that Dr. Murray was an independent contractor as a matter of law.

"The primary test of an employment relationship is whether the '"person to whom service is rendered has the right to control the manner and means of accomplishing the result desired . . . ."'  (*S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350 (*Borello*).)  Under this rule, the right to exercise complete or authoritative control must be shown, rather than mere suggestion as to detail.  A worker is an independent contractor when he or she follows the employer's desires only in the result of the work, and not the means by which it is achieved.  (*Varisco v. Gateway Science & Engineering, Inc.* (2008) 166 Cal.App.4th 1099, 1103.)"  (*Ali v. U.S.A. Cab Ltd.* (2009) 176 Cal.App.4th 1333, 1347.)  "'Whether a person is an employee or an independent contractor is ordinarily a question of fact but if from all the facts only one inference may be drawn it is a question of law.'  [Citation.]"  (*Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425, 431.)

The evidence fails to establish a triable issue that AEG had the right to control the manner and means of Dr. Murray's treatment of Michael.  It is undisputed that AEG contacted Dr. Murray and began contract negotiations as an accommodation to Michael.  Dr. Murray, Michael's personal physician of three years, was to be engaged at Michael's request and expense, in spite of AEG's suggestions that a London-based physician would be preferable.  The evidence also shows that AEG's interactions with Dr. Murray were

25

limited. AEG never instructed Dr. Murray on how to treat Michael, and no evidence was presented that AEG had the right to control Dr. Murray's treatment of Michael.

However, the Jacksons contend the draft contract created an employment relationship because it provided Dr. Murray to perform the work reasonably requested by AEG. This contention that the draft contracted created an employee relationship fails for two reasons. First, AEG and Dr. Murray never intended to include this language in the final contract. During contract negotiations, Dr. Murray discussed revisions to the draft contract terms, including changing a provision stating that Dr. Murray would perform "services reasonably requested by the Producer" to say that he would perform "services reasonably requested by the Artist." The exclusion of this revision was merely an oversight in the subsequent draft to reflect that Dr. Murray would perform the services requested by Michael, not by AEG. (See *Pistone v. Superior Court* (1991) 228 Cal.App.3d 672,681 ["The cases freely allow parties to contradict 'clear' contract language and show their actual relationships"].) The Jacksons presented no evidence to refute both parties' intention to revise the provision to read "services reasonably requested by the Artist." Second, disregarding the intention of the parties, the language in question would only give AEG the right to request reasonable medical services from Dr. Murray, not to direct the manner or means by which he provided those services.

The Jacksons also contend AEG exhibited its right to control Dr. Murray by assigning duties to him, including putting Dr. Murray in charge of Michael's rehearsal schedule with Gongaware, requiring Dr. Murray to attend meetings with AEG and Michael to discuss Michael's health, requiring Dr. Murray to report on his work to AEG, and directing Dr. Murray to accompany Michael for his insurance physical. AEG's inclusion of Dr. Murray in Michael's rehearsal schedule or meetings does not demonstrate AEG had to the right to control Dr. Murray. Furthermore, no evidence was presented to support the assertion that Dr. Murray was required to communicate with AEG to report on Michael's treatment. Also, the request by AEG to include Dr. Murray,

26

Michael's personal physician, on upcoming medical appointments does not denote AEG's control over the doctor.

"While the right to control work details is the most important factor, there are also '"secondary" indicia of the nature of a service arrangement.' (*Borello, supra,* 48 Cal.3d at p. 350.)" (*Ali v. U.S.A. Cab Ltd., supra,* 176 Cal.App.4th at p. 1347.) Our Supreme Court has noted that "[s]trong evidence in support of an employment relationship is the right to discharge at will, without cause." (*Empire Star Mines Co. v. California Employment Commission* (1946) 28 Cal.2d 33, 43, overruled on other grounds in *People v. Sims* (1982) 32 Cal.3d 468, 479, fn. 8.) Dr. Murray could be terminated by Michael for *any reason*, while AEG could *only* terminate Dr. Murray with proper cause. Thus, the uncontradicted evidence supports the trial court's conclusion that Dr. Murray was an independent contractor based on AEG's lack of right to control the manner and means of his treatment of Michael and because AEG could only terminate Dr. Murray's employment with cause.

Moreover, additional factors that have been "principally derived from the Restatement Second of Agency and include '(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of the employer-employee.' (*Borello, supra,* [48 Cal.3d] at p. 350; Rest.2d Agency, § 220.) 'Generally, the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' (*Borello, supra,* at p. 350.)" (*Ali v. U.S.A. Cab Ltd., supra,* 176 Cal.App.4th at pp. 1347-1348.)

Even if one or two of the individual factors might suggest an employment relationship, summary adjudication is nevertheless proper when, as here, all the factors weighed and considered as a whole establish as a matter of law that Dr. Murray was an independent contractor. (See *Arnold v. Mutual of Omaha Ins. Co.* (2011) 202 Cal.App.4th 580, 590.) Notably, Dr. Murray was engaged in a distinct occupation requiring a medical license and a high degree of skill acquired by years of specialized training. Dr. Murray was not supervised by AEG and as noted previously, no evidence was presented that Dr. Murray was required to report back to AEG. Dr. Murray was responsible for requesting his own medical equipment and an assistant from AEG. Absent such request, AEG was not responsible for providing medical equipment or an assistant. In fact, Dr. Murray was using his own medical equipment while treating Michael in Los Angeles and AEG was to provide a CPR machine to Dr. Murray only in London. AEG also did not provide work space for Dr. Murray because the doctor primarily worked out of Michael's Los Angeles residence. AEG was to pay Dr. Murray $150,000 a month for the duration of the *This Is It* tour, which was to span over a 10 month period. Furthermore, hiring a personal physician for an artist was not something that was a part of the regular course of AEG's business of concert production and promotion.

Finally, both AEG and Dr. Murray believed, at the time of contracting, they were creating an independent contractor relationship and not an employee relationship. (*Borello, supra,* 48 Cal.3d at p. 350.) During a police interview, Dr. Murray discussed his employment relationship with AEG. He stated Michael was the one who offered him the position of personal physician on tour. Dr. Murray was of the opinion that Michael would be his direct employer and did not discover until after he accepted the position that AEG would be paying for his salary. The draft contract was also a generic independent contractor agreement and provided only a general description of Dr. Murray's services, "general medical care" to be administered "professionally." Additionally, Dr. Murray operated his own incorporated entity, GCA Holdings, which was to be a party to the draft

28

agreement. Having his company a party to the agreement lends itself to an independent contractor status. Although a party's label is not dispositive (*Borello, supra,* at p. 349), it is persuasive given the fact that the parties actual conduct established an independent contractor relationship.

The Jacksons' reliance on *Arzate v. Bridge Terminal Transport, Inc.* (2011) 192 Cal.App.4th 419 (*Arzate*) is misplaced. In *Arzate*, Division Eight of this appellate district reversed the trial court's grant of summary judgment and found, "At its heart, this case involves competing, if not necessarily conflicting, evidence that must be weighed by a trier of fact. [Citation.]" (*Id.* at p. 427.) The court pointed to facts that were inconsistent with independent contractor status. The plaintiffs were contractually required to work exclusively for the trucking company. (*Id.* at p. 422). The company issued W-2 forms to the plaintiffs, withheld taxes, and offered health plan benefits. (*Id.* at p. 427.) The plaintiffs were also paid on an hourly basis for time spent waiting at a customer's facility, for delay time, for driver meetings, and other specific activities. (*Id.* at p. 423-424.) The plaintiffs working on certain holidays were also paid "one and one-half times the regular rate of pay . . ." (*Id.* at p. 424.) Most importantly, the defendant could terminate the plaintiffs with 24 hours notice. (*Id.* at p. 423.) The *Arzate* court reasoned that these factors were sufficient to overcome the claim that independent contractor status was established as a matter of law. (*Id.* at 427.) The plaintiffs in *Arzate* exhibited classic signs of both an independent contractor and employee, which evidence must be weighed by a trier of fact. Unlike *Arzate*, the Jacksons presented insufficient evidence to dispute Dr. Murray's status as an independent contractor. AEG did not have the right to control the manner and means of Dr. Murray's medical treatment of Michael and could not discharge Dr. Murray without cause. None of the additional factors derived from the Restatement Second of Agency supports a contrary result. The undisputed material facts demonstrate that the trial court reached the correct conclusion when it ruled Dr. Murray was an independent contractor, not an employee.

29

### 3. Peculiar Risk Doctrine

The Jacksons contend that if Dr. Murray was an independent contractor, rather than an employee, AEG is liable for his negligence under the doctrine of peculiar risk.

"At common law, a person who hired an independent contractor generally was not liable to third parties for injuries caused by the contractor's negligence in performing the work. [Citations.]" (*Privette v. Superior Court* (1993) 5 Cal.4th 689, 693.) Over time, courts have, for policy reasons created exceptions to this general rule, such as the doctrine of peculiar risk. The doctrine of peculiar risk "pertains to contracted work that poses some inherent risk of injury to others." (*Ibid.*) This exception arose from the recognition "that a landowner who chose to undertake inherently dangerous activity on his land should not escape liability for injuries to others simply by hiring an independent contractor to do the work." (*Id.* at pp. 693-694.) "The courts adopted the peculiar risk exception to the general rule of nonliability to ensure that innocent third parties injured by the negligence of an independent contractor hired by a landowner to do inherently dangerous work on the land would not have to depend on the contractor's solvency in order to receive compensation for the injuries. [Citation.] It was believed that as between two parties innocent of any personal wrongdoing—the person who contracted for the work and the hapless victim of the contractor's negligence—the risk of loss occasioned by the contracted work was more fairly allocated to the person for whose benefit the job was undertaken. [Citation.] Also, by spreading the risk of loss to the person who primarily benefited from the hired work, the court's sought to promote workplace safety, a concern of great significance to the public. [Citation.]" (*Id.* at p. 694.)

The peculiar risk doctrine can be best explained by examples of the types of risks which have been found to come within its scope. (*Castro v. State of California* (1981) 114 Cal.App.3d 503, 511.) Such risks include being struck by an automobile while eradicating traffic lines on a busy street, being run over by dump trucks backing up

during road construction work, explosions while painting the inside of a tank with a volatile paint, falling while working on a 10-foot high wall or on a 20-foot high bridge, electrocution while operating a crane near high voltage wires during bridge construction work, and a cave-in while working in a 14-foot deep trench. (*Ibid.*) "Even when work performed by an independent contractor posses a special or peculiar risk of harm, however, the person who hired the contractor will not be liable for injury to others if the injury results from the contractor's 'collateral' or 'casual' negligence. [Citations.] An independent contractor's negligence is collateral, . . . when the negligence involves an 'operative detail of the work, as distinguished from the general plan or method to be followed.' [Citation.]" (*Privette v. Superior Court, supra,* 5 Cal.4th at p. 696.)

The Jacksons have provided no authority that this doctrine, which originated to hold landowners responsible for the negligence of contractors engaged to perform work on their property, has ever been applied in the context of a corporation contracting with a doctor to provide "medical care" to a third party, nor have they made any argument as to why the doctrine should be applied in this type of situation. In the absence of such authority or argument, we need not further address their contention. (*Cahill v. San Diego Gas & Elec. Co.* (2011) 194 Cal.App.4th 939, 956 ["The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived"].)

### 4. Agency

The Jacksons assert for the first time on appeal that even if Dr. Murray was an independent contractor, independent contractors can also be agents and therefore AEG is vicariously liable under the doctrine of respondeat superior.

"An agent is one who represents another, called the principal, in dealing with third persons. (Civ. Code, § 2295.) Agency and independent contractorship are not *necessarily* mutually exclusive legal categories as independent contractor and servant or employee are. In other words, an agent may also be an independent contractor. (See

31

Rest.2d Agency (1958) § 2, com. b, pp. 13-14.)  One who contracts to act on behalf of another and subject to the other's control, except with respect to his physical conduct, is both an agent and an independent contractor.  (*Id.*, § 14N, p. 80.)"  (*City of Los Angeles v. Meyers Bros. Parking System, Inc.* (1975) 54 Cal.App.3d 135, 138.)  But, "'"[t]he law indulges in no presumption that an agency exists but instead presumes that a person is acting for himself and not as an agent for another."'"  (*Inglewood Teachers Assn. v. Public Employment Relations Bd.* (1991) 227 Cal.App.3d 767, 780.)

"[W]hether an agency relationship has been created or exists is determined by the relation of the parties as they in fact exist by agreement or acts [citation], and the primary right of control is particularly persuasive.  [Citations.]  Other factors may be considered to determine if an independent contractor is acting as an agent, including:  whether the 'principal' and 'agent' are engaged in distinct occupations; the skill required to perform the 'agent's' work; whether the 'principal' or 'agent' supplies the workplace and tools; the length of time for completion; whether the work is part of the 'principal's' regular business; and whether the parties intended to create and agent/principal relationship.  [Citation.]"  (*APSB Bancorp v. Thornton Grant* (1994) 26 Cal.App.4th 926, 932-933.)

The Jacksons contend Dr. Murray was AEG's agent based on the same evidence from which they argue he was an employee.  However, as the Jacksons properly recognize in their opening brief, there is substantial overlap in the factors for determining whether one is an employee or an agent.  (See *Rogers v. Whitson* (1964) 228 Cal.App.2d 662, 671.)  Because we were not persuaded that AEG had *any* right to control Dr. Murray in our independent contractor analysis nor persuaded by the identical factors outlined to establish both an agency and employee relationship, we cannot conclude that Dr. Murray was AEG's agent.  (Cf. *Seneris v. Hass* (1955) 45 Cal.2d 811, 830-832 [holding there was sufficient evidence of an agency relationship between a hospital and an anesthetist, and the trial court erred in taking the issue of agency from the jury].)

The Jacksons rely on *McGuigan v. Southern Pac. Co.* (1954) 129 Cal.App.2d 482 (*McGuigan*) to contend a licensed physician may be the agent of a corporation or other

business organization for purposes of respondeat superior. AEG does not dispute this contention, but argues that the circumstances of this case are inapposite. In *McGuigan, supra,* at page 494, a hospital was funded by a railroad and the hospital's doctors were hired at the direction of the railroad. A spouse of an employee brought an action against the railroad to recover damages for the death of her husband, claiming that his death resulted from the negligence of the employer, or from the negligence of others for whom the employer is liable. (*Id.* at p. 483.) The court held the railroad was liable because the hospital and its doctors were agents of the railroad as a matter of law. (*Id.* at p. 493-494.) The court reasoned "although the hospital may be an independent contractor in many respects, if a financial benefit accrues to the employer by the operation" of the hospital or the employer operates the hospital itself, the doctrine of respondeat superior applies. (*Id.* at p. 495.) We hold that AEG's relationship with Dr. Murray was not so intertwined as with the railroad and hospital in *McGuigan.* AEG did not pay Dr. Murray to provide medical care for all of its employees in determining their fitness for work. Dr. Murray was not a part of an entity that was funded by AEG to provide medical care, rather he was hired through his own company, GCA Holdings. Dr. Murray was also hired at the direction of Michael alone, and was only to provide medical care to Michael. AEG did not direct the manner or means of Michael's medical care. And although AEG was contracting to pay Dr. Murray for his medical services, Dr. Murray believed that Michael was his direct employer and he was working at Michael's behest. Thus, the trial court did not err in summarily adjudicating the respondeat superior issue.

## Jury Instructions and Special Verdict Form

The Jacksons contend the court erred in modifying the jury instructions and special verdict form for the negligent hiring, retention and supervision cause of action because they only address hiring and not the retention or supervision claims.

## A. Additional Facts

The jury was instructed with a modified California Civil Jury Instructions (CACI) Instruction No. 426 (negligent hiring, retention and supervision) and provided with a special verdict form modeled upon CACI No. 426. While each side presented its own version of CACI No. 426, the court gave neither side's version and instructed with the standard CACI No. 426, modifying it to add the first question, as follows:

"1.     That AEG Live hired Dr. Conrad Murray;

"2.     That Dr. Conrad Murray was unfit or incompetent to perform the work for which he was hired;

"3.     That AEG Live knew or should have known that Dr. Conrad Murray was unfit or incompetent and that this unfitness or incompetence created a particular risk to others;

"4.     That Dr. Conrad Murray's unfitness or incompetence harmed the plaintiffs; and

"5.     That AEG Live's negligence in hiring, supervising, or retaining Dr. Conrad Murray was a substantial factor in causing plaintiffs' harm."

Again, while each side presented its own proposed special verdict form, the court gave neither side's version and provided the jury with a special verdict form based upon CACI No. 426, modifying it to add Question No. 1, as follows:

"Question No. 1:  Did AEG Live hire Dr. Murray?

"Question No. 2:  Was Dr. Conrad Murray unfit or incompetent to perform the work for which he was hired?

"Question No. 3:  Did AEG Live know or should it have known that Dr. Conrad Murray was unfit or incompetent and that this unfitness or incompetence created a particular risk to others?

"Question No. 4:  Did Dr. Conrad Murray's unfitness or incompetence harm Michael Jackson and the Jackson Plaintiffs?

34

"Question No. 5:  Was AEG Live's negligence in hiring, supervising or retaining Dr. Conrad Murray a substantial factor in causing Michael Jackson and the Jackson Plaintiffs' harm?"[9]

The jurors were instructed to stop if they answered "no" to Question No. 1, however, if they answered "yes," to go on to Question No. 2.  The same language was reiterated for each subsequent question.  The jury returned a verdict in favor of AEG, answering "yes" to Question No. 1, and "no" to Question No. 2 on the special verdict form.

## B. Analysis

The Jacksons contend modifying CACI No. 426 to include an additional requirement that the jurors find AEG hired Dr. Murray in both the jury instructions and special verdict form (Question No. 1) was erroneous and deprived the jury of the opportunity to consider the Jacksons' negligent retention or supervision claims. [10]

The trial court's "duty to instruct the jury is discharged if its instructions embrace all points of law necessary to a decision.  [Citation.]  A party is not entitled to have the jury instructed in any particular fashion or phraseology, and may not complain if the court correctly gives the substance of the applicable law.  [Citation.]"  (*Thompson Pacific*

---

[9] Question Nos. 6 through 16 asked about damages.

[10] The Jacksons initially argue in their opening brief that the modification of CACI No. 426 along with the special verdict form were misstatements of California law because hiring is not a required element for a negligent hiring, retention and supervision claim, as they are three distinct theories of liability.  However, the Jacksons abandon this contention in their reply brief in stating that the trial court's modification of "CACI 426 to include an element of hiring for all three theories of liability, standing alone, is not the error."  We therefore will deem the argument that hiring is not an element of the cause of action waived and will not address the merits of this contention.

35

*Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 553.) "The propriety of jury instructions is a question of law that we review de novo. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1206.)" (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.) Similarly, a special verdict's correctness is analyzed as a matter of law and therefore subject to de novo review. (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092.)

The Jacksons contend the trial court erred by adding the requirement of hiring to CACI No. 426 and the special verdict form (Question No. 1) "as the first and free-standing element of the negligent hiring, supervision and retention cause of action, [because] the instruction suggested to the jury that the absence of negligent hiring disposed of the negligent supervision and retention theories." We disagree.

Specifying that in the question of whether AEG hired Dr. Murray was necessary given the dispute over who hired Dr. Murray, AEG or Michael. As the trial court noted, "The employment was neither stipulated nor obvious on its face." However, if the trial court began the jury instructions or special verdict form with, "Was Dr. Conrad Murray unfit or incompetent to perform the work for which he was hired," confusion was likely to result as the question assumed a hiring. Therefore, the jury needed to answer the question of whether AEG hired Dr. Murray before it could determine if AEG negligently hired, retained, or supervised him. The Jacksons' counsel agreed, ". . . there's no doubt there has to be some sort of arrangement or relationship between [them] -- there's no doubt about that. [¶] Is it -- does it have to be -- do they have to be the initial hirers? I don't know." Nothing about clarifying the employment relationship distorts the elements of the claim or confuses the jury instructions.

CACI No. 426 and the special verdict form did not place a misleading emphasis on negligent hiring. The Jacksons contend the juxtaposition of Question Nos. 1 and 2 misled the jurors to focus on the time of hiring, since Question No. 2 asked whether Dr. Murray was unfit or incompetent to perform the work for which he was hired. "In determining whether a jury was likely misled, the court must also evaluate "'(1) the state

36

of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." [Citation.]' [Citation.]" (*Spriesterbach v. Holland* (2013) 215 Cal.App.4th 255, 263.) [11] We find the plain reading of Question No. 2 asked whether Dr. Murray was unfit or incompetent to perform the work for *which he was hired*, it did not ask if Dr. Murray was unfit or incompetent *at the time he was hired*. Question No. 2 did not restrict the jurors' evaluation of Dr. Murray's competence only at the time of hiring. Additionally, the Jacksons' counsel argued in closing that the jury could consider Dr. Murray's competence at any time. The Jacksons' counsel repeated that argument in rebuttal. AEG's counsel did not argue to the contrary but focused on the fact that the "job for which [Dr. Murray] was hired" was as Michael's general physician and that Dr. Murray was competent for that job. Counsel for both sides correctly interpreted Question No. 2 for the jury, consistent with the law, and did not urge an interpretation that would cause confusion. Moreover, at no time during deliberations did a juror write a note to the court to ask a question about the verdict form or jury instructions or to express confusion about them. During deliberations, the jurors wrote several notes requesting supplies only. Throughout the five-month trial, individual jurors wrote notes to the court asking routine scheduling questions. No notes were received from the jury during deliberations expressing confusion over the jury instruction at issue or the verdict form. Lastly, the jury answered Question No. 1 favorably for the Jacksons, but answered Question No. 2 negatively. This suggests a careful consideration of each question on its own merits, exactly as the jurors were instructed to approach deliberations under CACI No. 5012 (jury to consider, answer, and vote on each question separately). (See *People v.* Edwards (2013) 57 Cal.4h 658, 746 [there is a presumption that the jurors understand and follow the court's instructions].) Therefore, neither the

---

[11] On January 13, 2014, the trial court granted AEG's motion to strike the Jacksons' juror affidavits in connection with their motion for a new trial. The Jacksons do not contest the court's ruling on appeal on this matter.

jury instructions or the special verdict form were erroneous, or somehow kept the jury from considering negligent retention or supervision.

## Special Verdict Form is Legally Sufficient

The Jacksons lastly contend the special verdict is legally insufficient to support the judgment. We disagree.

A special verdict is "fatally defective" if it does not allow the jury to resolve every controverted issue. (*Fuller–Austin Insulation Co. v. Highlands Ins. Co.* (2006) 135 Cal.App.4th 958, 1005-1006; *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 959-960.) The jury found that a required element of negligent hiring, retention and supervision was not proven in this case. The jurors responded "no" to Question No. 2 of the verdict form, finding that AEG hired Dr. Murray but that he was not unfit or incompetent for the job for which he was hired. Because Question No. 2 is a necessary element for the cause of action, the jury's finding that Dr. Murray was not unfit or incompetent for the job for which he was hired is therefore "dispositive of [AEG's] nonliability." (*Contreras v. Goldrich* (1992) 10 Cal.App.4th 1431, 1434.)

*Falls v. Superior Court* (1987) 194 Cal.App.3d 851, cited by the Jacksons, does not aid their position. *Falls v. Superior Court* involved an incomplete special verdict in which juror found in favor of the plaintiff in the first two questions presented (liability and proximate cause), but the jury could not reach a verdict on damages. This court rejected the plaintiff's argument that he was entitled to a partial judgment on the first two issues, because the jury did not make sufficient findings to completely dispose of liability in the plaintiff's favor. (*Id.* at p. 855.) Here, on the other hand, the jury's special verdict finding as to Question No. 2 completely resolved the issue of AEG's liability in its favor. The special verdict was legally sufficient.

## DISPOSITION

We affirm the judgment and award respondents AEG Live, LLC, AEG Live Productions, LLC, Brandon Phillips, and Paul Gongaware their costs on appeal.


KRIEGLER, J.

We concur:


MOSK, Acting P. J.


GOODMAN, J.*

---